Michael L. Rockwell and Regina Rockwell v. Commissioner.
Rockwell v. Commissioner
Docket Nos. 3768-68, 3340-70.
United States Tax Court
T.C. Memo 1972-133; 1972 Tax Ct. Memo LEXIS 123; 31 T.C.M. (CCH) 596; T.C.M. (RIA) 72133; June 22, 1972
Maurice H. Dolman, Jerrold L. Kaplan, Gerald I. Neiter, 1901 Avenue of the Stars, Los Angeles, Calif., for the petitioners. Marion Malone, Jonathan Brod, Michael J. Christianson, for the respondent. *124 ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: Respondent determined deficiencies in income and self-employment tax against the petitioners as follows: Year
Deficiency
Docket No. 3768-68
1963
$194,625.63
1964
34,444.80
1965
89,368.81
Docket No. 3340-70
1966
202,801.85
1967
135,207.86 The issues presented for decision in this case are: (1) whether petitioner held various real property primarily for sale to customers in the ordinary course of a trade or business requiring that the gain in the taxable years in question from various sales of such property be taxed as ordinary income instead of capital gain as reported by petitioner, and that the gains and losses on exchanges of real property be recognized; (2) whether certain real property for which petitioner claimed depreciation deductions for the taxable years 1963 through 1966 was property so held primarily for sale to customers and therefore not subject to depreciation; and (3) whether petitioner is liable for self-employment tax for the taxable years in question. The allowable deductions for medical expenses for the taxable years 1963, 1965, 1966, and 1967 *125 and for contributions for the taxable year 1965 are in issue only because they depend upon the proper amount of adjusted gross income. Some of the facts have been stipulated and are incorporated herein by reference. Findings of Fact Michael L. Rockwell and Regina Rockwell were husband and wife during the taxable years 1963 through 1967 and, at the times of filing of the petitions herein, were residents of Los Angeles County, California. They filed their joint Federal income tax returns for the taxable years in question with the district director of internal revenue, Los Angeles, California. Petitioners filed their joint Federal income tax returns for the taxable years 1957 through 1962 with the district director of internal revenue, Los Angeles, California. As a matter of convenience, Michael L. Rockwell will hereinafter be referred to as the petitioner. On his Federal income tax returns for the years 1952 through 1967, petitioner listed his occupation as "investor." He is, and has been for some time, listed in the 597 telephone book as "Rockwell, Michael L. - Investments." Petitioner has never handled investments for anyone other than himself, nor has he ever advised anyone *126 else as to investments. During 1963 and part of 1964 petitioner rented an office in the CEIR Building on Wilshire Boulevard in Beverly Hills, California, paying in excess of $200 per month rent. Sometime in 1964 he moved to a building at 9601 Wilshire Boulevard and rented an office suite, paying about $330 per month rent. This office consisted of a small reception room with a reception desk and space for a secretary and two separate offices. Petitioner never hired a full-time secretary. He occasionally had someone come in on a part-time basis. The telephone in petitioner's office was connected to a 24-hour answering service. Petitioner's returns for the years in question reflect the use of two automobiles for business purposes. One was a Chevrolet station wagon which was used 100 percent for business in connection with a motel in Palm Springs and later in Palm Desert. The other was a Cadillac which was used 80 percent for business by petitioner in going to look at various properties that he owned and so forth. Petitioner first worked in retail clothing stores. Later, he opened a dress shop of his own. He left the clothing business in the early 1950's. Prior to May 1954 petitioner *127 had bought and sold several pieces of real estate. Petitioner developed some of this property into income-producing property. By a grant deed recorded May 1, 1951, he transferred a lot to Helen Weller. By a grant deed recorded November 25, 1952, petitioner transferred one lot and part of another lot to Arroyo-Cypress Corporation. This transfer included the assumption of a $75,000 trust deed by the grantee. By a grant deed recorded May 11, 1953, he transferred part of six lots to Hunt Transfer Company, Inc. By a grant deed recorded June 30, 1953, petitioner transferred two lots to Norma Davis. By a grant deed recorded October 27, 1953, he transferred two lots and parts of two other lots to Joseph and Helen Koch. Prior to May 1954, petitioner owned a store building on Florence Avenue in Los Angeles, California. Adjacent to the store building was a small lot used for parking in the back. On May 13, 1954, he traded the real property (improved with the store building) on Florence Avenue for property located on Overland Avenue, Los Angeles, California. The Overland Avenue property consisted of 2 lots that were improved by a store building and 2 unimproved lots adjacent thereto. When petitioner *128 acquired the store building on the Overland property, the stores in it were tenanted. Petitioner kept the building and continued to collect the rent until January 30, 1961, when the state of California acquired it through the process of condemnation because of the construction of a freeway. He kept the 2 unimproved lots until Januar 8, 1958, when he traded them as part of the purchase price for his residence in Beverly Hills, California. Petitioner paid some additional cash for this residence. He did not report the trade of these two unimproved lots for his residence on his 1958 tax return. When he made this trade, he made no attempt to sell the store building located on the other 2 lots. In 1954, petitioner purchased real property on Hazeltine and Murietta Avenues in Sherman Oaks in Los Angeles County, California. Sherman Oaks is in the San Fernando Valley. When he acquired this property it was his intention to develop apartment houses thereon which he would then hold for the income they produced. Petitioner constructed 7 sets of 2 apartment buildings each on this property. The Murietta Apartment sets were completed on the following dates: May 1, 1955; June 1, 1955; August 1, 1955; *129 July 1, 1956; and August 1956. The Hazeltine Apartment sets were completed on or about June 1, 1954. Each set consisted of 2 buildings facing each other with a common pool and garden area and a common garage. Each of the Murietta Apartment sets and one of the Hazeltine Apartment sets contained 24 rental units. The other Hazeltine Apartment set contained about 36 units. After the construction of the apartment buildings, petitioner held those buildings and collected rentals thereon until he disposed of the buildings. In about September or October 1956, petitioner moved to Palm Springs, California. He looked for an apartment, but was unable to find a suitable one. On November 29, 1956, he purchased a residence in Palm Springs. This was his only residence at the time. Palm Springs is about 105 miles from Los Angeles. Petitioner lived in Palm Springs for about a year, and lived on the income from the apartment sets. He had some tenants in the Murietta Apartment sets and the 598 Hazeltine Apartment sets who managed the apartment sets. He had also trained a woman to act as general manager over all the other managers. He occasionally travelled back from Palm Springs to Sherman Oaks to *130 see his general manager. After he left Palm Springs, he had no further use for his residence and it was sold on July 14, 1958. Petitioner decided to return to the Los Angeles area from Palm Springs when he began having problems with vacancies in the apartment sets, problems with his managers, and other problems with the apartment sets. The buildings had deteriorated faster than he had anticipated. Some of the buildings had many children in them who were damaging the buildings, and the managers were unable to control this. When he returned, petitioner also discovered that his general manager had previously moved out of the apartment she was using and had used it only when petitioner had made his visits from Palm Springs. After he returned to the Los Angeles area, petitioner made the apartment that his general manager had been using into an office. He then tried to restore the apartment sets to the condition that they had been in when he had left to go to Palm Springs. He advertised in a number of newspapers to try to fill the vacancies. Sometime prior to September 30, 1957, petitioner was approached by a real estate broker acting for Cromwell Oil Company, and was asked if he wanted *131 to sell one of the Murietta Apartment sets. Petitioner told the broker that he might consider selling the property if the price was right. He told the broker to bring him an offer and he would consider it. At this time petitioner was think about disposing of all the Murietta Apartment sets and Hazeltine Apartment sets, but had not made up his mind to do so. Petitioner was thinking that he might not be able to solve completely all the problems with the buildings. On September 30, 1957, petitioner sold one of the Murietta Apartment sets to Cromwell Oil Company for $235,000, consisting of cash and a promissory note secured by a purchase money trust deed. On his 1957 return he reported a gain on this sale of $115,915.10 and elected to use the installment method for reporting it. He kept the promissory note and collected the monthly payments thereon until 1963. In his return for 1963 he reported long-term capital gain in the amount of $39,387.51 attributable to payments on the note in that year. By October 1957, petitioner had decided to dispose of all the remaining Murietta Apartment sets and the Hazeltine Apartment sets because he thought that the problems with the buildings were too *132 difficult for him and that it would be too costly to get them back in the conditions they were in when he had left for Palm Springs. The state of his health also influenced petitioner's decision to sell these buildings. He had had a hernia operation in the early 1950's and problems with this condition were recurring at this time. Prior to disposing of the remaining apartment sets petitioner made no effort to obtain a new general manager or to hire an apartment management firm to operate them. In October 1957, petitioner sold two of the Murietta Apartment sets to Mr. and Mrs. Ned B. Grossman of Pocatello, Idaho, for cash, a note secured by a purchase money trust deed and a theatre in Pocatello. The sales price was $460,000, resulting in a gain of $222,726.15. Petitioner kept the promissory note and collected the payments thereon until it was paid in 1961. Petitioner accepted the theatre as part of the consideration for the sale in order for the purchasers to meet his price. The theatre was closed at the time of the sale and was an old small building with torn seats. After the sale, petitioner tried to lease or sell the theatre building, but was unable to do so. On December 7, 1964, the *133 theatre was traded to Berkshire Development Corporation. [1] In his return for the year 1963 the petitioner claimed depreciation on the theatre building in the amount of $800. On September 12, 1958, the two remaining Murietta Apartment sets were sold to Trucano and Stowe for cash, a note secured by a purchase money trust deed, and a piece of property, hereinafter referred to as the Wilshire Medical Building property. The sales price was $565,000, producing a gain of $315,576.27, all of which was reported in his return for 1958. Petitioner kept the note that he received and collected the monthly payments thereon. The Wilshire Medical Building property consisted of a remodeled building and an old house in the rear. Its fair market value 599 as of the time of the sale was $315,000. Petitioner did not want the Wilshire Medical Building property, but accepted it in order to get the price he wanted. He wanted to dispose of such property so he could "cash out" his *134 investment. He was unable to sell it but traded it on January 29, 1959, for an apartment house at 5820 Hazeltine Avenue, Van Nuys, California. The fair market value of the apartment house at 5820 Hazeltine Avenue was $303,553.32 and the gain on this trade was $14,135.58. The equity difference between these two properties at the time of the trade was slight. The building at 5820 Hazeltine was an older building which needed some repairs and which had some vacancies. Petitioner did not want to keep this building and the only way that he could dispose of it to get the price he wanted was by trading it. On April 24, 1959, he traded the apartment building at 5820 Hazeltine Avenue for the palm Desert Motel in Palm Desert, California. Petitioner did not report any gain from this trade on his return for 1959. He was uable to sell the Palm Desert Motel and traded it on February 1, 1960, for the Western Sands Motel in Indio, California. The gain on the trade was $35,744.43. The Western Sands Motel was an old motel which petitioner did not want to keep. He still wanted to cash out. On August 10, 1961, petitioner traded the Western Sands Motel for a house in Palm Desert and certain notes known *135 as the Meredith Coffin Trust Deeds. The gain on this trade was $9,668.40. He treated this as an installment sale and reported capital gain of $271.80, $857.22, and $2,875.40, respectively, in his returns for 1963, 1964, and 1965. Petitioner thought he would use the house in Palm Desert occasionally for weekends because he liked the desert. When he found that he was not using it enough he decided to sell it. On May 24, 1961, petitioner sold the Palm Desert house at a gain of $17,216.55, which he reported in full as capital gain in his return for 1961. On February 11, 1958, petitioner sold one of the Hazeltine Apartment sets to a Mr. Hoagland for cash, a note secured by a purchase money trust deed, and the transfer of a pomissory note secured by a fourth or fifth trust deed on property referred to as the Clybourne Apartment. On his 1958 return, petitioner reported a sales price of $235,000, capital gain of $129,870.66 and elected to use the installment method for reporting the gain. He kept the note secured by the purchase money trust deed and collected the monthly payments thereon until it was completely paid in 1964. In his returns for 1963 and 1964 petitioner reported gain in *136 the respective amounts of $6,859.46 and $20,488.44 arteibutable to payments in those years. Petitioner also collected on the note secured by the fourth or fifth trust deed on the Clybourne Apartment. During the first half of 1962, a senior lienholder on the Clybourne Apartment started foreclosure. Under California law, if this senior encumbrance were foreclosed, all junior trust holders, including petitioner, would lose all interest in the property. Petitioner acquired the Clybourne Apartment on May 16, 1962, by a deed in lieu of foreclosure. He took over the operation of this property and collected the rental income. During the year that he held it, the rental income was over $37,000. The building was a very old one and needed repairs. Petitioner tried to make some repairs, but it was impossible to repair it completely. When he acquired it the building had a 48 percent vacancy rate. He placed advertisements in newspapers and filled up most of the vacancies. The problems with this property were too burdensome for petitioner. A broker contacted petitioner and told him that he had a client who wanted to purchase the property and would offer a good price. On May 17, 1963, petitioner *137 sold the Clybourne Apartment for $370,000 resulting in a gain of $100,782.62. In his return for 1963 petitioner reported such gain as long-term capital gain. On August 3, 1959, petitioner sold the remaining Hazeltine Apartment set for cash, a purchase money trust deed, and the Ranch-O-Tel Motel in Fresno, California. The sales price was $310,583.40, resulting in a gain of $182,804.80, which was reported in full in petitioner's return for 1959. Petitioner accepted the motel as part of the consideration for the sale because this was the only way that he could get his price. Petitioner did not try to sell the motel right after he acquired it because he thought he would try to generate income from it. It was a good commercial motel, and its resident manager at the time petitioner acquired it has remained. Petitioner still owns the property and in his returns for each of the years 1963 through 1967 he has claimed depreciation thereon. [2] 600 Petitioner's tax returns for the taxable years 1958 through 1961 were previously audited by the Internal Revenue Service. The principal cause of the changes *138 recommended by the Internal Revenue Service resulted from the application of section 1031 of the Internal Revenue Code of 1954, to the exchange of properties. Petitioner had treated these transactions as sales and not as exchanges. Sometime around 1959 or 1960, petitioner had a major hernia operation. By the beginning of 1961, his health had become much better. On January 30, 1961, using the proceeds received from the state of California for the condemnation of the Overland Avenue store building, petitioner acquired 12 acres of vacant land in San Dimas, California, for the development of a shopping center. San Dimas is about 20 miles from downtown Los Angeles. In connection with trying to develop the shopping center, petitioner hired Joseph Tannenbaum to negotiate leases and manage the shopping center and to act as a broker in acquiring property for him. Tannenbaum worked for petitioner for some time and contacted several prospective tenants for petitioner. Tannenbaum had an agreement with petitioner under which he received a fixed salary and an amount for automobile expenses. There was also an understanding between them that Tannenbaum would forego his part *139 of any commission arising on any purchase of property that Tannenbaum would make for petitioner. Petitioner was able to obtain lease commitments from Safeway Food Stores and Thrifty Discount Drug Stores and had talked to Texaco Oil Company, Grants, and others with regard to the proposed shopping center, but was unable to obtain any other commitments. He kept trying to develop the site, but never constructed a shopping center there. He discovered that he was unable to compete with professional shopping center owners. On September 12, 1962, the San Dimas property was sold, and petitioner reported long-term capital gain therefrom in the amount of $165,280.05 in his return for 1962. [3]
On February 6, 1962, petitioner purchased a small, unimproved corner lot next to the San Dimas property, known as the Hook property. In connection with his proposed shopping center petitioner had been trying to lease a corner of the San Dimas property to a major oil company for a gas station. He had learned that some *140 oil companies had been trying to get a location close by and had tried to acquire property adjacent to the Hook property which was the only corner available in the vicinity. After he sold the San Dimas property, petitioner traded the Hook property to the Berkshire Development Corporation on December 7, 1964. [4]
In 1961, petitioner acquired unimproved real property in Downey, California. It was a long narrow parcel adjacent to a corner market. He acquired the Downey property because he thought that it was a good site for another possible shopping center. Nothing was ever built on the Downey property. Petitioner gave Tannenbaum an option to purchase the property. Tannenbaum exercised the option in 1963 and sold it off in parcels. The petitioner received $425,829.35, resulting in a gain of $173,711.65, which he reported in full in his return for 1963 as long-term capital gain. In the summer of 1962, petitioner attempted to acquire a 3-acre site on Clark Street *141 in Encino. This site consisted of 3 separate 1-acre portions each owned by different people. Petitioner acquired title to the 2 outside lots in August 1962. One of the parcels was purchased from Mr. Krupp and contained an apartment house and 3 single family residences. The other parcel was acquired from Mr. Hinds and contained several single family residences. The owner of the middle lot sold it to someone else, instead of petitioner. Petitioner filed a lawsuit for specific performance against the owner of the middle lot. He never acquired title to it. On December 7, 1964, petitioner traded the two outside lots to Berkshire Development Corporation. In the summer of 1962, petitioner entered into an agreement with 6 proposed transferors owning 6 adjacent pieces of real property, hereinafter referred to as the White Oak property. The White Oak property is in the San Fernando Valley and consists of about 10 1/2 acres containing several old houses some of which were vacant. 601 This property was brought to petitioner's attention by Tannenbaum who showed him a newspaper advertisement stating that it was for sale subject to a zoning change. Petitioner answered the advertisement and *142 was offered a package deal by a real estate broker. The agreements of sale provided that petitioner did not have to conclude the sale unless the property was satisfactorily rezoned by the City of Los Angeles and unless all of the proposed transferors would then execute deeds to petitioner. An application for zone change was filed with the City of Los Angles byt the requwated change was denied. One of the proposed transferors, Mr. Del Giorno, threatened to revoke his offer to petitioner. However, petitioner acquired this portion of the property in the summer of 1962. He prosecuted an appeal from the zone change denial. He acquired the balance of the White Oak property on March 25, 1963. On May 7, 1963, the zoning council approved petitioner's appeal and rezoned the property from RA-1 to R3-1. Under the zoning classifications, property zoned RA-1 is suburban property which is limited to certain agricultural uses, and property zoned R3-1 can be used for multiple dwellings. All zoning changes are tentative. This is to assure that the improvements upon which the zoning change is based are made within a reasonable time after the change is approved. In prosecuting the appeal on the zoning *143 change for the White Oak property, petitioner hired George Moll, a planning consultant, to help him win the appeal. In working on the appeal, Moll learned that some of the residents in the neighborhood of the White Oak property were in favor of the zoning change while some were opposed to it. As he was leaving the hearing room after the zone change was approved, Moll was approached by another client of his who told him that he would like to purchase the White Oak property for $1,000,000. Moll informed petitioner of this and petitioner rejected it, saying that the property was worth more than that. While petitioner held the White Oak property, Tannenbaum collected the rents and managed the property. In his return for 1963 the petitioner claimed depreciation with respect to the White Oak property in the amount of $15,241.80. Petitioner never built an apartment house on the White Oak property. On December 7, 1964, he traded it to Berkshire Development Corporation. In 1966, the petitioner had Jack White & Associates prepare a set of work drawings for proposed apartment houses for the White Oak property. Robert Risan, who was a general contractor and was working with petitioner at *144 the time, spent some time working on plans for the White Oak property and helped design the floor plans. In 1966, the White Oak property was still zoned R3-1 and the local opposition had subsided. In early 1966, petitioner consulted Robert Ciani, vice president of J. Helpin & Company, a mortgage brokerage house. He submitted the plans for the White Oak project to Ciani so that Ciani could evaluate the proposed project and try to secure permanent financing for it. Ciani put together a mortgage presentation and submitted it to various institutional investors, but was unable to arrange a loan for petitioner. Petitioner also contacted Gordon Stimson, president of Wallace Moir Company, another mortgage brokerage house. Petitioner submitted a loan package for the development of the White Oak property to Stimson. The loan package included a full set of plans and specifications and financial projections. Stimson gave this package to Moir's appraisal department for an analysis as to possible financing. He then had informal discussions with an insurance company as to financing for the project but was unsuccessful in obtaining a loan for petitioner. Petitioner was otherwise unable to secure *145 any permanent financing for the proposed development of the White Oak property. On September 12, 1962, petitioner acquired real property located at the corner of Ventura Boulevard and Yarmouth Avenue in Encino, California, hereinafter referred to as the Ventura-Yarmouth property. This property was deeded to petitioner from his attorney, Lertzman. On the same day, Lertzman had previously acquired part of the property from the Strite family and the remaining portion of the property from the Jackson-Anderson families. Petitioner used Lertzman as his nominee to purchase this property because he did not want to disclose his own identity to the sellers. Petitioner had a letter agreement with his attorney under which Lertzman also acted as his nominee in acquiring other property. The Ventura-Yarmouth property was improved by an old gas station and part of it 602 was rented as a used car lot. When petitioner acquired it, it was zoned for commercial uses and he did not intend to file an application for a zoning change. Petitioner never made any improvements on the property. He was contacted by a real estate broker, who told him that he could get a good price for the rear portion of *146 the property. On June 5, 1963, petitioner sold the back half of the Ventura-Yarmouth property for $166,600, resulting in a gain of $46,586.33, which he reported in full in his return for 1963 as long-term capital gain. In such return petitioner claimed depreciation with respect to the Ventura-Yarmouth property in the total amount of $2,765.07. Petitioner was also contacted by another real estate broker who was acting for a bank which wanted to acquire the front portion of the Ventura-Yarmouth property. The bank wanted to build an office in that area and felt that petitioner's property was the most desirable corner in the area. In August 1963, he gave the bank a 90-day option, for $1,500, to purchase the front portion of the property. The bank exercised the option and on January 2, 1964, petitioner sold the front portion of the Ventura-Yarmouth property for $325,000, and in his return for 1964 reported long-term capital gain of $166,305.40. On September 12, 1962, petitioner purchased the Topanga-Gysel property, which was unimproved land with a 200-foot frontage on Topanga Canyon Boulevard in Canoga Park, California. This property is in the San Fernando Valley. It was deeded to petitioner *147 by Lertzman, who had acquired it on the same date. In order to develop an apartment house on the property it would have been necessary to have the property rezoned for multiple dwellings. Petitioner did not inquire into the possibility of getting it rezoned before he acquired it, nor did he ever file an application for a zone change for the property. On October 17, 1963, petitioner traded the Topanga-Gysel property to Craig Properties, Inc., for a part of a property known as the Craig Property, realizing a gain on the trade of $56,042.50. In his return for 1963 the petitioner reported long-term capital gain in the amount of $37,870 on the trade. The other portion of the Craig Property had previously been acquired by Joseph and Bertha Tannenbaum who deeded such portion to petitioner within 2 months after the petitioner had acquired the first portion. On November 15, 1963, Howard Craig of Craig Properties, Inc., filed an application for a zone change for the Topanga-Gysel property. On January 2, 1964, the planning commission disapproved the application as filed, but did approve tentative zone changes for the property to R4-1 (multiple dwelling) and RS-1 (suburban, single-family dwellings).
*148 The Craig Property consisted of 6 acres of unimproved property in Woodland Hills, California. The property is in the San Fernando Valley. After acquiring the property the petitioner filed an application for a zone change to permit multiple dwelilings, but it was denied. He did not appeal the denial. He traded the Craig Property to Berkshire Development Corporation on December 7, 1964. [5]
On October 29, 1962, petitioner acquired the Van Owen Property, which was a 3-acre site on Van Owen Boulevard in Canoga Park. The property is in the San Fernando Valley. When he acquired it, the property was improved with two single family residences. To build an apartment house on the property it would have been necessary to have it rezoned for multiple dwelling. Petitioner never filed an application for *149 a zone change, nor did he ever build on the property. He traded the Van Owen property to Berkshire Development Corporation on December 7, 1964. In his return for 1963 petitioner claimed depreciation with respect to the Van Owen property in the amount of $930.20. On December 14, 1962, petitioner purchased the Topanga-Kennedy property, consisting of a 9-acre parcel on Topanga Boulevard near Burbank Boulevard, improved by 2 single family residences. On August 5, 1964, he filed an application for a zone change with the city planning commission to have the property tentatively rezoned R5 (multiple dwellings). On October 7, 1964, the city planning commission recommended a tentative rezoning of part of the property to R5-1 (high rise apartment) and part to RA-1 (single family 603 residence), which recommendation was passed by the council of the City of Los Angeles. Petitioner never improved the property. On May 25, 1967, petitioner sold the Topanga-kennedy property for $700,000, and in his return for 1967 he reported long-term capital gain of $432,693.04 and ordinary gain in the amount of $1,532.45. In his returns for the years 1963 through 1966 petitioner claimed depreciation with *150 respect to the Topanga-Kennedy property in the respective amounts of $2,670.21, $2,510.00, $2,359.40, and $2,217.84. The Clark Street, White Oak, Ventura-Yarmouth, Topanga-Gysel, Van Owen, and Topanga-Kennedy properties are all in the San Fernando Valley. The construction of multiple dwellings in the San Fernando Valley rose in volume during the years from 1960 through 1963. The volume had been on a rising trend from 1954, especially when compared to the construction of single family dwellings in the valley. The market for loans for new construction was fairly good through the first half of 1963. In 1964, the volume of construction of multiple dwellings began to decline and continued to do so through 1966. The situation started to improve somewhat in 1967. In 1966, high interest rates and inadequate supplies of mortgage funds furthered the decline of residential building in southern California. During the period from 1963 through 1967, the market for multiple dwellings in the San Fernando Valley was over supplied and vacancies were high. As a result there were very few loans for the construction of new apartment houses in the Valley. On December 20, 1963, petitioner acquired the *151 Turquoise Villa Motel in Palm Springs, at a cost of $71,381.65. He purchased it with a low down payment. He thought that it needed some work and that he would repair it. He acquired it with the intention of holding it for income and of using it occasionally for himself on weekends. While he held it, he experienced problems caused by absentee management. He also discovered that the maintenance problems exceeded his expectations and that it would cost a substantial amount to repair it. Petitioner was friendly with some real estate brokers in Palm Springs who knew that he owned the Turquoise Villa Motel. One of these brokers offered to make a trade with him for the motel. On November 24, 1964, petitioner transferred the Turquoise Motel for $10,382 in cash and 78 acres of unimproved land in Palm Springs adjacent to a new freeway. In his return for 1964 the petitioner reported gain of $65,519.92 of which $58,704.01 was recognized as long-term capital gain. Petitioner made this trade in order to relieve himself of the management problems he was having with the motel and of monthly losses of about $700 that he was incurring while he held the property. In 1969, petitioner sold the 78 acres *152 at a loss. In his return for the year 1963 the petitioner claimed depreciation on the Turquoise Villa Motel in the amount of $197.56. On November 29, 1963, petitioner purchased the Lombardi property, consisting of approximately 18 1/2 acres of unimproved land at the northeast corner of Topanga Canyon Boulevard and Nordhoff Street in Encino, Los Angeles County, California. This property is in the San Fernando Valley. In order to build an apartment building on the property it would have been necessary to have it rezoned for multiple dwellings. Petitioner never filed an application for a zone change and never made any improvements to the property. On December 23, 1965, petitioner sold the Lombardi property to Irving Tushner for $1,050,000, resulting in a gain of $319,082.48, which petitioner reported in his return for 1965 as long-term capital gain. On October 23, 1963, petitioner purchased 20 acres of unimproved property on Saticoy Avenue in North Hollywood, hereinafter referred to as the first Saticoy property. On December 7, 1964, he traded the Hook property, the Pocatello Theatre, the two Clark Street properties, the White Oak property, the Craig property, and the Van Owen property *153 to Berkshire Development Corporation for 2 unimproved pieces of property, namely: the Rosecrans property, consisting of the surface rights to approximately 93 acres near Rosecrans and South Figueroa Streets in Los Angeles; [6] and the 604 second Saticoy property, being 20 acres of unimproved land on Saticoy Avenue near Laurel Canyon Boulevard in North Hollywood, California, contiguous to the first Saticoy property that he already owned. In his return for the year 1964 the petitioner treated the transaction as a tax-free exchange, showing $1,000,000 as the value of the consideration received and $1,028,233.15 as the cost of the properties transferred (less depreciation of $26,669.94), resulting in a loss of $1,563.21. *154 In order to permit the construction of an apartment house on the Saticoy property, it would have been necessary to have the property rezoned. On February 6, 1964, petitioner hired George Moll to obtain a zoning change on the land located on Saticoy Avenue. This included the Saticoy property that petitioner then owned and the Saticoy property that he subsequently acquired from Berkshire Development Corporation. Moll was successful in having the City of Los Angeles rezone this property to R3-1 (multiple dwellings). Petitioner attempted to obtain loans from several lending institutions to enable him to build apartment houses. Petitioner was unable to obtain such loans and accordingly was not able to develop such apartments. Prior to that, in 1966 or 1967, he had offered to sell the Saticoy property for approximately $1.25 per square foot to the bankers who had purchased a part of the Ventura-Yarmouth property. They looked at the property but decided not to buy it. When petitioner acquired the Rosecrans property, it was zoned for industrial use. Part of the property was in the City of Los Angeles and part was in the county of Los Angeles. Three oil companies had sub-surface leases *155 on the property. Located on the property were 22 oil wells, oil tank batteries, an oil tank farm and oil pipelines running throughout the area. Petitioner acquired no interest in these improvements. There were some very steep grades on the east side of the property and there were some problems with water flooding. Petitioner engaged in substantial development work with respect to the property. An engineering survey was conducted, topographical maps were prepared, various cost estimates were figured and layout maps were drawn. Risan worked with petitioner on this and helped design plans for apartment houses for the Rosecrans property. All such plans for the Rosecrans property contemplated the same basic design. Petitioner made an application for a zone change and it was denied. He appealed the denial and was successful after he showed the planning department the various plans he had prepared for the development of the property. Most of the property that was within the City of Los Angeles was rezoned to RD-2 suitable for an FHA or similarly financed large apartment complex project. Petitioner and his attorney negotiated with the various oil companies about securing a release of their *156 rights in the property and moving the oil pipelines so as to make the property useable for development. Petitioner was successful in getting oil companies to release some of their rights and agreeing to the removal of pipelines at his expense. His cost of removing pipelines was in excess of $100,000. He graded the property to the east where the slopes were steep. However, he was unable to get releases of all the oil companies' rights and parts of the property remained unuseable. Petitioner attempted to get construction and permanent financing from several lending institutions in an attempt to build a multi-unit residential development, but was unsuccessful in doing so. He talked to various lending institutions including the FHA about obtaining financing for an FHA designed program which was intended for lower income families. Early in 1966, petitioner was approached by a real estate broker representing oil companies seeking corner lots suitable for setting up gas stations. The broker informed petitioner of Mobil Oil Company's desire to purchase the northwest corner of the Rosecrans property. Petitioner first told the broker that he was not interested in selling the corner site *157 since he was attempting to develop the property into a large apartment complex. The broker then suggested that a sale of the corner would not interfere with the proposed development. Although petitioner did not agree to this at that time, he subsequently gave Mobil Oil Company an option to purchase 10 acres of the Rosecrans property. This option was never exercised. The broker also made an offer for Humble Oil Company to purchase the northwest corner and petitioner made a counter offer. They agreed upon a price of $135,000. On March 7, 1967, petitioner sold the corner piece of the Rosecrans property to Humble Oil for $135,000, resulting in a gain of $44,168 which petitioner reported in his return for 1967 as long-term capital gain. 605 On or about December 22, 1966, petitioner sold a portion of the Rosecrans property located outside the City of Los Angeles to R. A. Watt & Co., a major real estate developer in southern California, for $922,161, resulting in a gain of $666,294.85, which petitioner reported as long-term capital gain in his return for 1966. R. A. Watt & Co. acquired the property in order to develop an industrial park. As part of the sale, petitioner granted R. A. *158 Watt & Co. an option on an additional portion of the property which was exercised and acquired by R. A. Watt & Co. on October 2, 1968. During 1967, an industrial real estate broker was looking for a site in the area of the Rosecrans property for a large warehouse for an aircraft company. He saw the Rosecrans property and thought that it might be suitable. There were no signs on the property or any other indication that petitioner was the owner of the property. The broker located the petitioner by use of the county assessor's map book. Sometime in April or May 1967, the broker contacted the petitioner and asked if the property was for sale. Petitioner told him that it was not for sale because he wanted to develop the property for industrial purposes and hold it for the income it would produce. Petitioner indicated that he had no experience with industrial development. After he had met with petitioner, the broker met a representative of Rubin Industrial Development Corporation which was a developer of industrial property. In developing property, Rubin did not purchase the land but entered joint ventures with the land owner. The broker introduced Rubin's representative to petitioner. *159 There were numerous meetings over a period of almost a year at which they discussed a possible joint venture to develop a portion of the Rosecrans property. Rubin spent considerable sums for engineering studies, layouts, market surveys and so forth. Rubin finally decided against a joint venture with petitioner because it felt that petitioner's financial condition was too insecure. On or about May 3, 1968, and on July 11, 1968, petitioner sold two pieces of the Rosecrans property to Rubin Industrial Development Corporation. The balance of the Rosecrans property is still owned by petitioner, subject to a security interest in the Bank of America. Petitioner never built anything on the Rosecrans property. After he was unsuccessful in obtaining loans for its development, the City of Los Angeles, on its own initiative, rezoned it back to M2-1 (industrial uses). While petitioner held the Rosecrans property, real estate taxes increased considerably. Petitioner began to experience serious financial problems in the latter part of 1965, about the time of the sale of the Lombardi property to Tushner. At such time he was delinquent on most of his loans, and his financial problems continued *160 throughout the years in question. Some of the property that petitioner had acquired prior to 1965, had been purchased with a cash down payment and the balance financed with loans for periods from 1 to 2 years. In 1965, the market for money started to become tight and there was a shortage of loanable funds. As a result, petitioner began experiencing problems as his loans became due and he had difficulties obtaining extensions. As heretofore stated, on December 4, 1964, the Bank of America made petitioner a loan of $825,000 secured by the Rosecrans property. Petitioner received an extension of this loan which was originally due December 3, 1966. The principal balance of this loan at the end of 1965 was still $825,000; at the end of 1966 it was $817,033.21; at the end of 1967 it was $577,800; and at the end of 1968 it was $445,000. This loan was finally paid off in February 1970. In 1965, about 3 or 4 months after the Rosecrans loan was made, a loan for about $450,000 which petitioner had on the Topanga-Kennedy property became due. The Bank of America made petitioner a loan of approximately $450,000 so that he could pay off such loan. Petitioner gave the Bank of America a deed of *161 trust on the Topanga-Kennedy property as security for this new loan. This loan was not repaid until the end of 1967. At the time of the Rosecrans loan, the Bank of America anticipated that it would also make unsecured loans to petitioner on a 90-day note basis so that petitioner could remove the oil wells and otherwise prepare the Rosecrans property so that it could be put to its highest and best use. According to the Bank of America's appraisal department's report on January 8, 1965, the highest and best use of the Rosecrans property was for industrial development. The Bank of America made petitioner substantial loans on the 90-day note basis. The principal balance of these loans at the end of 1965 was $500,000; at the end of 1966 it was $550,000; at the end of 1967 it was $1,692,629.78; and at the end of 1968 it was $905,026.33. These loans were finally paid off in February 1970. In making these 606 loans, the Bank expected that petitioner would become a depositor and maintain balances of about 10 to 15% of the outstanding balance of such loans. From the very beginning, petitioner did not maintain the balances which the Bank thought were necessary. In the latter part of *162 1965, the Bank of America started to take a second look at petitioner's financial situation when it learned that the oil wells and leases were not being removed from the Rosecrans property and the property was not being developed as rapidly as it had hoped. In 1966, the Bank informed petitioner of its concern. Six months prior to the original maturity of the Rosecrans loan, the Bank became quite serious about what was going to happen and tried to encourage petitioner to do what was necessary for him to meet the loan's maturity. As time went by and the other loans were not being repaid as originally intended, the Bank also became concerned about what was going to happen to them. The Bank had frequent discussions about what petitioner's plans were to generate funds to liquidate these loans. The Bank was not concerned with the exact time of repayment but was concerned about what his plans were so that there could eventually be repayment. During their discussions, the Bank did not try to tell him what to do. It was satisfied that petitioner was trying and therefore did not start any action of its own. The Bank tried to cooperate with petitioner while he was liquidating his debt to it. *163 American Savings and Loan Association had made a loan to petitioner, which was secured by a deed of trust on one of the 20-acre Saticoy parcels. This loan, which had a balance of $431,000, came due on November 1, 1966. American Savings and Loan finally agreed to extend the loan for six months to May 1, 1967 after petitioner paid a loan fee of $8,628.24 and agreed to an increase in the interest rate from 7% to 10%. On May 2, 1967, the day following the due date, American Savings and Loan ordered the trustee under the deed of trust to commence foreclosure proceedings. The Bank of America made a loan to petitioner which enabled him to pay off American Savings and Loan. The Bank of America took as collateral to secure this loan a deed of trust on 20 acres of the Saticoy property which had previously secured the American Savings and Loan loan, and the assignment of a promissory note executed to petitioner by Tushner for approximately $900,000 which was secured by a trust deed on the Lombardi property. Columbia Savings and Loan Association held petitioner's note secured by deed of trust on the 20 acres of Saticoy which adjoined the parcel that secured the note held by American Savings *164 and Loan Association. This loan became due in about June or July 1967. Columbia Savings and Loan Association threatened foreclosure. An employee of the Bank of America was able to persuade Columbia Savings and Loan Association to extend petitioner's loan. During the period from 1965 through 1967, petitioner also had substantial other indebtedness. As indicated on a summary taken from petitioner's general ledger, such indebtedness included indebtedness with respect to a property thereon referred to as the "Berkshire" property. This indebtedness was in the amount of $500,000 as of January 1965 and $490,946.57 as of December 1967. From 1965 to the date of trial, petitioner acquired no new real property. Petitioner has never advertised any of the property that he held during the years in question as being for sale. Petitioner's income tax returns for the years 1957 through 1967 show the following gross rental income, capital gains, and total taxable income: Years
1957
1958
1959
1960
1961
1962
Rental Income
$194,355.54
$ 93,946.58
$ 54,692.06
$ 44,166.49
$36,268.00
$ 49,443.84
Less: Rental Expenses
Depreciation
59,397.58
31,918.34
26,228.64
19,149.00
14,625.57
21,214.28
Interest
40,389.19
20,625.51
23,900.58
8,532.86
16,446.79
30,759.79
Other Rental Expenses 77,934.86
62,292.42
50,677.74
38,082.87
52,608.87
63,553.51
Income or (Loss)
$ 16,633.91
($20,889.69)
($46,114.90)
($21,598.24)
($47,413.23)
($66,083.74)
Interest Income
4,281.09
23,798.55
38,163.10
41,827.59
45,273.14
33,008.58
Land Trust Deed Pay-Off
517.23
Cap. Gains (50%)
70,858.98
184,532.24
116,783.46
55,389.57
39,507.90
88,585.53
Misc. Income
( 529.63)
5,304.92
Tot. Taxable Inc. $ 92,291.21
$186,911.47
$114,136.58
$ 75,618.92
$ 37,367.81
$ 55,510.37
Reported income tax liability
$ 39,878.85
$ 92,266.12
$ 48,548.93
$ 22,900.82
$ 4,105.59
$ 9,307.25
*165 607 Years
1963
1964
1965
1966
1967
Rental Income
$ 53,224.46
$ 47,819.60
$ 31,805.04
$ 32,597.64
$ 27,007.38
Less: Rental Expenses
Depreciation
30,974.33
7,133.22
7,201.86
6,844.23
4,438.53
Interest
126,036.03
172,965.62
170,209.98
274,647.87
156,906.65
Other Rental Expenses 81,767.31
61,841.97
106,104.12
57,327.23
96,059.91
Income or (Loss)
($185,553.21)
($194,121.21)
($251,710.92)
($306,221.69)
($230,397.71)
Interest Income
30,024.91
26,768.43
98,396.61
8,310.01
36,556.60
Land Trust Deed Pay-Off
Cap. Gains (50%)
202,734.69
120,497.92
160,047.17
333,147.42
239,962.97
Misc. Income
747.26
39,437.59
22,492.73
4,056.33
4,015.08
Tot. Taxable Inc. $ 47,953.65
($ 7,417.27)
$ 29,225.59
$ 39,292.07
$ 50,136.94
Reported income tax liability
$ 4,553.80
0
0
0
0
In the notice of deficiency in Docket No. 3768-68 respondent determined that the gains reported by petitioner in 1963, 1964, and 1965 as capital gains constituted ordinary income since they resulted from sales of property held primarily for sale to customers in the ordinary course of petitioner's trade or business, and that gains and *166 losses on exchanges of real property were ordinary gains and losses and were recognizable. He decreased capital gains for those years by the amounts of $202,734.69, $120,381.80, and $160,047.18, respectively, and increased ordinary income by the amounts of $423,641.87, $222,954.45 and $320,094.35, respectively. Thus, for 1963, he determined that the gains from the sales of the Clybourne Apartment, the portion of the Ventura-Yarmouth property, and the Downey property constituted ordinary income; that the gain on the trade of the Topanga-Gysel property for the Craig property constituted ordinary income; and that the profit attributable to collections on the Cromwell Oil trust deed, the Hoagland trust deed and the Meredith Coffin trust deed constituted ordinary income. For 1964, he determined that the gain from the sale of the other portion of the Ventura-Yarmouth property constituted ordinary income; that the gain on the trade of the Turquoise Villa Motel for the 78 acres of unimproved land in Palm Springs was ordinary income; that the petitioner realized an ordinary loss on the trade of various properties to the Berkshire Development Corporation on December 7, 1964; and that the profit *167 attributable to collections on the Hoagland trust deed and the Meredith Coffin trust deed constituted ordinary income. For 1965, he determined that the gain from the sale of the Lombardi property resulted in ordinary income, and that the profit attributable to collections on the Meredith Coffin trust deed constituted ordinary income. Respondent also determined that some of the depreciation deductions claimed for 1963, 1964, and 1965 were not allowable "inasmuch as the property with respect to which those depreciation amounts were claimed was stock in trade and did not constitute property used in a trade or business or held for the production of income within the purview of section 167 of the Internal Revenue Code." For 1963, respondent disallowed the depreciation deductions claimed for the Pocatello Theatre, the Clark Street properties, the Ventura-Yarmouth property, the Van Owen property, the Topanga-Kennedy property, the White Oak property and the Turquoise Villa Motel. For 1964 and 1965, he disallowed the depreciation deductions claimed for the Topanga-Kennedy property. For 1963, 1964, and 1965, respondent determined that petitioner was a real estate *168 dealer and therefore liable for the tax on self-employment income. In the notice of deficiency in Docket No. 3340-70, respondent determined that the gains reported by petitioner in 1966 and 1967 as capital gains constituted ordinary income since they resulted from sales of property held primarily for sale to customers in the ordinary course of petitioner's trade or business. He decreased capital gains for those years by the amounts of $333,147.42 and $239,962.96, respectively, and increased ordinary income by the amounts of $666,294.85 and $468,524.50, respectively. Thus, for 1966, respondent determined that the gain from the sale of part of the Rosecrans property to R. A. Watt & Co. constituted ordinary income. For 1967, he determined that the gains from the sales of the Rosecrans corner to Humble Oil and of the Topanga-Kennedy property constituted ordinary income. For 1966, he determined that the depreciation deduction claimed for the Topanga-Kennedy property was not allowable "inasmuch as the property with respect to which the depreciation amount was claimed was stock in trade and did 608 not constitute property used in a trade or business or held for the production of income *169 within the purview of section 167 of the Internal Revenue Code." For 1966 and 1967, respondent also determined that petitioner's income from sales of real property was subject to self-employment tax. The following properties were properties held by petitioner primarily for sale to customers in the ordinary course of his trade or business: the Hook property; the Downey property; the Clark Street properties; the White Oak property; the Ventura-Yarmouth property (including both the front and rear portions thereof which were disposed of by petitioner at different times); the Topanga-Gysel property; the Craig property; the Van Owen property; the Topanga-Kennedy property the Lombardi property; the Rosecrans property; and the portion of the Saticoy property obtained by petitioner from Berkshire Development Corporation. The following properties were not properties held by the petitioner primarily for sale to customers in the ordinary course of his trade or business but were properties held for the production of income: The Murietta Apartments; the Hazeltine Apartments; the Pocatello Theatre; the Western Sands Motel; the Clybourne Apartment; and the Turquoise Villa *170 Motel. The following property was property held by petitioner for investment: the 78 acre property in Palm Springs. Opinion The main issue presented for decision is whether the gains realized by petitioner during the years 1963 through 1967 from sales of real property during such years, as well as gains reported by him in such years which were attributable to installment sales in prior years, constituted ordinary income as determined by the respondent, or capital gains, and whether the gains and losses realized by petitioner on certain exchanges of property in 1963 and 1964 should have been recognized in such years as determined by respondent. The respondent's determinations are presumed to be correct and the petitioner has the burden of proving them wrong. Welch v. Helvering, 290 U.S. 111. The resolution of the above issue depends upon whether the properties sold were capital assets in petitioner's hands or were held by him primarily for sale to customers in the ordinary course *171 of a trade or business within the meaning of section 1221(1) of the Internal Revenue Code of 1954, [7] and upon whether the properties exchanged were held primarily for sale within the meaning of section 1031(a) of the Internal Revenue Code of 1954. [8] It is the respondent's position that the various properties involved were held by the petitioner primarily for sale to customers in the ordinary course of his trade or business. He cites Corn Products Refining Co. v. Commissioner, 350 U.S. 46, for the proposition that the capital gains provisions are an exception to the normal tax rates and, thus, are to be narrowly construed. The Supreme Court there pointed out that Congress intended that profits and losses arising from the everyday operation of a business are to be considered as ordinary income or loss rather than capital gain or loss, that the preferential capital gains treatment applies to transactions in property which are not the normal source of business income, and that such treatment was intended to relieve the taxpayer from excessive tax burdens on gains resulting from a conversion of capital investments and to *172 remove the deterrent effect of those burdens on such conversions. Subsequently, in Malat v. Riddell, 383 U.S. 569, the Supreme Court stated that 609 the words of revenue acts should be interpreted where possible in their ordinary, everyday sense. There it set forth the following rule for interpreting section 1221: The purpose of the statutory provision with which we deal is to differentiate between the "profits and losses arising from the everyday operation of a business" on the one hand ( Corn Products Refining Co. v. Commissioner of Internal Revenue, 350 U.S. 46, 52, S. Ct. 20, 24, 100 L. Ed. 29) and "the realization of appreciation in value accrued over a substantial period of time" on the other. ( Commissioner of Internal Revenue v. Gillette Motor Transport, Inc., 364 U.S. 130, 134, 80 S. Ct. 1497, 1500, 4 L. Ed. 2d 1617.) * * * In Malat it was held that the word "primarily" as used in section 1221(1) means "of first importance" or "principally." *173 Respondent contends that, with the exception of the San Dimas property, the petitioner's acquisitions and dispositions of real property from the early 1950's through the years in question constituted a trade or business and that he held the properties involved in the years in question primarily for sale to customers in the ordinary course of such trade or business. Although there have been numerous cases deciding this issue in a variety of factual contexts, the ultimate decision depends upon a consideration of all the pertinent facts in the particular case. See Los Angeles Extension Company v. United States, (C.A. 9) 315 F. 2d 1, where the Court stated in part as follows: It is rare indeed that one will find any precedent value in applying the decision of one case to the facts of another case. At the most, other cases decided by the courts on this subject may be persuasive or suggestive of the approach of the courts to cases where the facts may be somewhat similar. Many factors have been detailed by the courts as aids in determining this issue, although no one test is necessarily *174 decisive. Among the criteria used are the purpose of the taxpayer in acquiring a property; the length of time a property is held; the continuity and frequency of sales; the substantiality of the income from the sales; and the activity of the seller with respect to the property, such as the presence or absence of improvements to increase its marketability or activities in promoting sales, including advertising or listing with real estate brokers. See, e.g., W. T. Thrift, Sr. 15 T.C. 366. As pointed out by respondent, in determining whether property is held primarily for sale, the fact that it was not originally acquired for resale is not controlling. Rather, the test is whether the property was primarily held for sale when the sale was made. See Klarkowski v. Commissioner, (C.A. 7) 385 F. 2d 398, and Estate of Peter Finder, 37 T.C. 411. Upon a careful consideration of the entire record, it is our opinion that the petitioner has failed to prove that most of the properties involved were not held by him primarily for sale to customers in the ordinary course of a trade or business and, with exceptions hereinafter noted, we accordingly approve *175 the respondent's determinations. Turning to the record, it seems that petitioner became significantly involved in real estate sometime in the early 1950's after he had left the retail clothing business. The numerous real estate transactions to which he was a party during such time, coupled with an apparent lack of any other income-producing activity of significance, lead us to the conclusion that he was then engaged in the real estate business. Nowhere has he shown the contrary. Sometime in 1954 petitioner acquired property on Murietta and Hazeltine Avenues upon which, over the course of the succeeding two years, he developed 7 sets of apartment buildings, 6 of such sets containing 24 rental units and the other about 36 rental units. Shortly after the last apartment set was completed petitioner moved from the Los Angeles area to Palm Springs where he purchased a residence and lived on the income produced by the apartments he had developed. In view of this, it seems clear that the apartments were developed and held by him primarily for the production of income and not for sale to customers in the ordinary course of a trade or business. Subsequently, problems with absentee management *176 forced petitioner to return to Los Angeles where, because of such problems together with his relatively poor health at such time, he decided to dispose of the apartments. Some of the apartments were sold by petitioner and some were traded for other apartments either to enable him to obtain an appropriate price or to obtain a more readily marketable property. The reason advanced by petitioner at the trial, namely, that the transactions flowing from the disposition of the Murietta and Hazeltine apartments were made so that he could 610 "cash out" his investment in the apartments was, under the circumstances, plausible and we accordingly hold that the gains realized by petitioner upon sales of the apartment sets constituted capital gains, and that the properties which petitioner acquired in exchange for the apartment sets likewise constituted capital assets in his hands and the gains or losses realized upon disposition of such properties were appropriately accorded capital gains treatment. As stated by the court in Heller v. Commissioner, (C.A. 9) 382 F. 2d 675: * * * where *177 the facts clearly demonstrate that a taxpayer held certain property as an investment, and further show that this purpose continued until shortly before the time of a sale, and that the sale is prompted by a liquidation intent, the taxpayer should not lose the benefits provided for by the capital gain provisions. * * * Moreover, although the matter is not free from doubt, we have concluded that the Clybourne Apartment and the Turquoise Villa Motel also constituted capital assets in petitioner's hands. Such properties were not dissimilar to the type of income-producing properties the petitioner had previously held or then held, and, under the circumstances, his reasons for acquiring and disposing of such properties were not implausible. We accordingly hold for petitioner with respect to such properties. We are not satisfied, however, that any of the other properties which petitioner owned were not held by him primarily for sale to customers in the ordinary course of a trade or business. In this connection we should note that petitioner's case was largely based upon his own testimony. While we have few, if any, reservations as to holding for a petitioner upon the basis of his own *178 testimony despite its inherently self-serving characteristics, in our view the testimony proffered by the petitioner herein was extremely general in nature, seemingly inconsistent at times, and, in the main, substantially uncorroborated. As such its probative value was accordingly reduced. About the beginning of 1961 petitioner's health had markedly improved and, in the view we take of the record, he again turned to real estate, not, however, as a long-term investor or one engaged in liquidating previous investments, but as an individual intending to derive his day-to-day livelihood therefrom. Thereafter his purchases, sales, and exchanges of real estate were frequent and continuous, particularly in view of the size of the properties with which he dealt. The income produced from such transactions was substantial in comparison with his other sources of income and it is apparent that his activities with respect to these properties occupied most of his working time. While it is true that he did not advertise the properties he held, it is also apparent that such was not necessary since he was relatively well-known to the various brokers who frequently sought him out. It is our conclusion *179 that during the years in question the petitioner was engaged in the trade or business of dealing in real estate. In any event, he has not borne the burden of showing that he was not. Turning again to the record, in early 1961 petitioner acquired a 12-acre property known as the San Dimas property whereon he unsuccessfully attempted to develop a shopping center. About a year and a half later such property was sold by him for a substantial gain. During the course of his activities with respect to the San Dimas property the petitioner learned that some oil companies were trying to lease the corner property adjacent to it for use as a service station. Such property, known as the Hook property, was the only corner property available in the immediate area. Petitioner acquired the Hook property in early 1962 and, at trial, he testified that his purpose in acquiring it was to preclude the oil companies from doing so in order that an oil company would then have to lease a corner of the San Dimas property at an enhanced rental. He testified that the Hook property was a marginal property and that additional adjacent property would have been necessary to support a service station. He further *180 testified that after he had disposed of the San Dimas property he had no further use for the Hook property and accordingly traded it to Berkshire Development Corporation in December 1964. Be this as it may, we are not satisfied that the petitioner did not hold the Hook property primarily for sale to customers in the ordinary course of a trade or business. Indeed, it seems somewhat implausible that an oil company desirous of obtaining a corner property for its greater accessibility would accept instead the corner of a property with frontage on only one road. On the other hand, 611 it would seem that the rapid enhancement in value for service station usage of a corner property fortuitously situated next to a newly developing shopping center would hold out the promise of immediate profit to be derived from the purchase and resale of such property. Sometime in 1961 the petitioner also acquired the Downey property which he thought might be a good site for another shopping center. At the trial he testified that he attempted to develop such property in conjunction with the San Dimas property. However, nothing was built on the Downey property, nor is there any evidence as to what activities *181 were engaged in by petitioner with respect to its development. [9] Petitioner further testified that he sold the Downey property to his employee, Joseph Tannenbaum, in 1963 so that the latter might derive a profit on the ultimate disposition of such property. However, the substantial gain realized by petitioner upon such sale somewhat belies the generous motive which purportedly prompted it. Again, we are not satisfied that the petitioner did not hold the Downey property primarily for sale to customers in the ordinary course of a trade or business. Beginning in the summer of 1962 and during the course of the next several months the petitioner acquired 6 relatively sizable properties in the San Fernando Valley, namely, the Clark Street properties, the White Oak property, the Ventura-Yarmouth property, the Topanga-Gysel property, the Van Owen property, and the Topanga-Kennedy property. Such properties were either unimproved or improved by older structures of *182 marginal value. Except as to the Ventura-Yarmouth property, the petitioner testified in a formulistic manner that each of the properties was acquired with the intent of developing an apartment house thereon which he would then hold for the income it produced. As to the Ventura-Yarmouth property, he stated that it was his intention to develop a commercial building thereon to provide him with the office space necessary to manage his other properties as well as additional rental income to be derived from leasing any excess space. Nothing was ever built or developed by petitioner on any of the above properties and such properties were either sold by him for substantial gains, exchanged for other property, or traded by him to the Berkshire Development Corporation. At the trial he testified to problems involving the failure of adjacent property owners to convey necessary properties, the inability to obtain favorable zoning, and local political opposition when favorable zoning was obtained, as constituting some of the reasons why none of the properties were developed. Suffice it to say, he protested too much. Illustrative of the insufficiency of his case is that presented with respect to *183 the White Oak property. This property, consisting of 6 adjacent parcels of property, was acquired by petitioner subject to obtaining zoning suitable for an apartment development. Such zoning was finally obtained by him after prosecuting an appeal from an initial denial. However, he did not proceed to develop apartments thereon because, he testified, there was substantial political opposition to the zoning change. In this regard we can only note that the zoning classification obtained by petitioner was not revoked, nor did he show that anyone ever attempted to revoke it. Subsequently, in December 1964, the property was traded by him to Berkshire Development Corporation. However, some two years later petitioner once more engaged in substantial activity with respect to the potential development of the White Oak property, having plans drawn for proposed developments, and submitting such proposals to various financial concerns for potential financing. He testified that such activity was engaged in because Berkshire Development Corporation was in default to a savings and loan association which held the first trust deed on the White Oak property and that to protect his position on a "second *184 trust on this property or perhaps a couple of blanket second trust deeds," it might have been necessary for him to reacquire the property. We note, however, that in his return for 1964 the petitioner did not report taking back any notes from the Berkshire Development Corporation when the two purportedly exchanged only properties, nor is there any other evidence as to when such an indebtedness might have arisen. [10] Moreover, the extensiveness of the activities he engaged in with respect to the 612 White Oak property appears somewhat incongruous for one having no present interest in the property. In view of the above, we are not satisfied that any of the above-mentioned properties (as well as the property for which the Topanga-Gysel property was exchanged, namely, the Craig property which was ultimately traded to Berkshire Development Corporation) were not held primarily for sale to customers in the ordinary *185 course of a trade or business. After having been unsuccessful in his purported attempts to develop smaller apartment projects, the petitioner's testimony was to the effect that he turned his attentions to developing large apartment complexes. It was with such intention, he testified, that he acquired the Lombardi property - 18 1/2 acres, the Saticoy property - 40 acres, [11] and the Rosecrans property - 93 acres. As to the Lombardi property, petitioner never filed applications for the necessary zoning changes, nor did he make any improvements to the property. While there is substantial evidence to the effect that he was financially overextended at the time of the sale of the Lombardi property *186 in 1965, and that the proceeds from such sale helped to alleviate that condition, we are not satisfied that he did not hold such property primarily for sale to customers in the ordinary course of a trade or business at the time such sale was made. Turning to the Rosecrans property, petitioner again testified that he intended to develop a large apartment complex on such property, but that difficulties in obtaining the necessary financing precluded him from doing so. It is clear that petitioner was successful in having a portion of such property rezoned to a classification suitable for the development of an apartment complex, and there is evidence that he attempted to obtain financing for such a project. It is also clear that the petitioner incurred substantial expenses in grading the property and in removing oil pipelines therefrom so as to make it suitable for development. However, it seems apparent that about the beginning of 1966 petitioner's intentions with respect to developing the property changed and that subsequently he held such property primarily for subdivision and sale as industrial property. The facts that within a period of about 2 years an option with respect to 10 *187 acres of the property was given to one oil company, a portion of such property was sold for development as an industrial park and the purchaser was given an option on an additional portion which was exercised, the corner of the property was sold to another oil company for use as a service station, and 2 portions of the property were sold to an industrial development corporation, all lend support to such view. Thus, we are not satisfied that the Rosecrans property was not held by petitioner primarily for sale to customers in the ordinary course of a trade or business. From our findings and conclusions hereinabove, it follows that gain or loss is to be recognized upon the exchange by petitioner of properties with Berkshire Development Corporation in 1964. Further, that petitioner is entitled to depreciation on those properties which we have found to be held for the production of income, but not on those properties which were found to have been held primarily for sale to customers in the ordinary course of his trade or business. Finally, it also follows that for each of the years in question *188 the petitioner is liable for the tax on self-employment income imposed by section 1401 of the Internal Revenue Code of 1954. Decisions will be entered under Rule 50. Footnotes
1. The record is devoid of any detailed evidence regarding Berkshire Development Corporation. It was formed by Murray Lertzman, who was petitioner's attorney, but there is no evidence as to the ownership of its stock.↩
2. Respondent does not question petitioner's right to these depreciation deductions.↩
3. Although the year 1962 is not before us it has been stipulated that petitioner purchased, held, and sold the San Dimas property as an "investor" and not as a "real estate dealer".↩
4. In 1967 the petitioner asked a real estate broker to sell the Hook property, but the broker was unsuccessful. There is no explanation as to what interest, if any, the petitioner had in the Hook property at that time.↩
5. A summary taken from petitioner's general ledger for the years 1965, 1966, 1967, and a part of 1968 shows that petitioner was indebted with respect to the Craig Property in the amount of $206,000 until December 1965. There is no explanation of this indebtedness or as to what interest, if any, petitioner had in the Craig Property after it was traded to Berkshire Development Corporation.↩
6. It has been stipulated, and we have accordingly found, that petitioner acquired the Rosecrans property on December 7, 1964, from Berkshire Development Corporation in exchange for other properties. There is credible evidence that petitioner purchased the Rosecrans property from the trust department of the Bank of America. On December 4, 1964, petitioner executed a not for $825,000 to Bank of America payable on December 3, 1966, which was secured by a deed of trust on the Rosecrans property, such encumbrance remaining in existence beyond the years in question. There is no explanation of how Berkshire Development Corporation acquired the property or why petitioner incurred, prior to the trade date, this indebtedn ss.↩
7. Section 1221(1) of the Code provides as follows: SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; ↩
8. Section 1031(a) of the Code provides as follows: SEC. 1031. EXCHANGE OF PROPERTY HELD FOR PRODUCTIVE USE OR INVESTMENT. (a) Nonrecognition of Gain or Loss From Exchanges Solely in Kind. - No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.↩
9. We note in this regard that whatever concessions the respondent may have made with respect to the San Dimas property do not serve as evidence of petitioner's intentions and activities with respect to the Downey property.↩
10. Indeed, this is but one transaction which calls into question petitioner's relationship to the Berkshire Development Corporation during the years before us - a relationship as to which we have little substantive evidence and are, accordingly, merely left to wonder.↩
11. The Saticoy property was sold by petitioner after the years before us and, thus, there is no issue presented with respect to the nature of the gains or losses there realized. However, at the time a portion of such property was acquired by petitioner on the exchange of properties with Berkshire Development Corporation, it is our opinion that such portion was property held primarily for sale to customers in the ordinary course of petitioner's trade or business and we have so found.↩