JOHN E. THORNE, PETITIONER *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

JOHN E. THORNE, TRUSTEE, PETITIONER *v.* COMMISSIONER
OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 15467–80, 29911–85.          Filed July 20, 1992.

*Luther J. Avery* and *Boyd A. Blackburn, Jr.,* for petitioner.
*Cynthia K. Hustad* and *Ann M. Murphy,* for respondent.

SCOTT, *Judge:* These consolidated cases were assigned to Special Trial Judge Stanley J. Goldberg pursuant to section 7443A(b)(4) and Rules 180, 181, and 183. All section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. The Court agrees with and adopts the opinion of the Special Trial Judge, which is set forth below.

### OPINION OF THE SPECIAL TRIAL JUDGE

GOLDBERG, *Special Trial Judge:* Respondent determined that petitioner is liable for deficiencies in excise taxes, additions to tax, and penalties as follows:

Docket No. 15467–80:

| *TYE Dec. 31,* | | *Amount* |
|---|---|---|
| 1976 | Deficiency | |
| | Sec. 4945(b)(2) | $3,500 |
| 1977 | Deficiency | |
| | Sec. 4944(b)(2) | 10,000 |
| | Sec. 4945(b)(2) | 5,958 |

Docket No. 29911–85:

| *TYE Dec. 31,* | | *Amount* |
|---|---|---|
| 1978 | Deficiency | |
| | Sec. 4944(a)(2) | $5,000 |
| | Additions to tax | |
| | Sec. 6651(a)(1) | 1,125 |
| | Sec. 6651(a)(2) | 1,250 |
| | Penalty sec. 6684 | |
| | Due to sec. 4944(a)(2) | 5,000 |
| 1979 | Deficiency | |
| | Sec. 4944(a)(2) | 5,000 |
| | Additions to tax | |
| | Sec. 6651(a)(1) | 1,125 |
| | Sec. 6651(a)(2) | 1,250 |
| | Penalty sec. 6684 | |
| | Due to sec. 4944(a)(2) | 5,000 |
| 1980 | Deficiency | |
| | Sec. 4944(a)(2) | 5,000 |
| | Sec. 4945(a)(2) | 270 |
| | Sec. 4945(b)(2) | 5,408 |
| | Additions to tax | |
| | Sec. 6651(a)(1) | 1,186 |
| | Sec. 6651(a)(2) | 1,186 |
| | Penalty sec. 6684 | |
| | Due to sec. 4944(a)(2) | 5,000 |
| | Due to sec. 4945(a)(2) | 270 |
| | Due to sec. 4945(b)(2) | 5,408 |
| 1981 | Deficiency | |
| | Sec. 4944(a)(2) | 5,000 |
| | Sec. 4945(a)(2) | 11,312 |
| | Sec. 4945(b)(2) | 33,750 |
| | Additions to tax | |
| | Sec. 6651(a)(1) | 3,670 |
| | Sec. 6651(a)(2) | 2,691 |
| | Penalty sec. 6684 | |
| | Due to sec. 4944(a)(2) | 5,000 |
| | Due to sec. 4945(a)(2) | 11,312 |
| | Due to sec. 4945(b)(2) | 33,750 |
| 1982 | Deficiency | |
| | Sec. 4944(a)(2) | 5,000 |
| | Sec. 4945(a)(2) | 50 |
| | Sec. 4945(b)(2) | 1,000 |
| | Additions to tax | |
| | Sec. 6651(a)(1) | 1,136 |
| | Sec. 6651(a)(2) | 606 |
| | Penalty sec. 6684 | |
| | Due to sec. 4944(a)(2) | 5,000 |
| | Due to sec. 4945(a)(2) | 50 |
| | Due to sec. 4945(b)(2) | 1,000 |

| *TYE Dec. 31,* | | *Amount* |
|---|---|---|
| 1983 | Deficiency | |
| | Sec. 4944(a)(2) | 5,000 |
| | Sec. 4945(a)(2) | 100 |
| | Sec. 4945(b)(2) | 2,000 |
| | Additions to tax | |
| | Sec. 6651(a)(1) | 1,147 |
| | Sec. 6651(a)(2) | 306 |
| | Penalty sec. 6684 | |
| | Due to sec. 4944(a)(2) | 5,000 |
| | Due to sec. 4945(a)(2) | 100 |
| | Due to sec. 4945(b)(2) | 2,000 |
| 1984 | Deficiency | |
| | Sec. 4944(a)(2) | 5,000 |
| | Penalty sec. 6684 | |
| | Due to sec. 4944(a)(2) | 5,000 |
| *Taxable period ended* | | |
| May 8, 1985 | Deficiency | |
| | Sec. 4944(b)(2) | $70,000 |
| | Sec. 4945(b)(2) | 42,158 |
| | Penalty sec. 6684 | |
| | Due to sec. 4944(b)(2) | 70,000 |
| | Due to sec. 4945(b)(2) | 42,158 |

Generally, these cases involve foundation excise taxes under sections 4944(b)(2) and 4945(a)(2) and (b)(2), where respondent determined that petitioner, as foundation manager, refused to remove from jeopardy a foundation investment, agreed to make taxable expenditures, and refused to correct such expenditures. After concessions by respondent, the specific issues for decision are: (1) Which party bears the burden of proof for purposes of section 4945(a)(2); (2) whether petitioner refused to agree to the removal of a jeopardy investment made by the Harry E. Wright, Jr. Charitable Trust (the trust) in 1977; (3) whether petitioner agreed to the making of taxable expenditures by the trust during 1980 through 1983; (4) whether petitioner refused to agree to the correction of any taxable expenditures made by the trust during 1976, 1977, and 1980 through 1983; and (5) whether petitioner is liable for penalties pursuant to section 6684 for the taxable years 1980 through 1983.

Respondent's concessions leave the following amounts in dispute:

Docket No. 15467–80:

*Deficiency*

| Taxable year | Sec. 4944(b)(2) | Sec. 4945(b)(2) |
|---|---|---|
| 1976 | - - - | $3,500 |
| 1977 | $10,000 | 5,958 |

Docket No. 29911–85:

| | *Deficiency* | | *Penalty* |
|---|---|---|---|
| Taxable year | Sec. 4945(a)(2) | Sec. 4945(b)(2) | Sec. 6684 |
| 1980 | $270 | $5,408 | $5,678 |
| 1981 | 5,187 | 13,750 | 18,937 |
| 1982 | 50 | 1,000 | 1,050 |
| 1983 | 100 | 2,000 | 2,100 |

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by reference. Petitioner resided in Los Gatos, California, when he filed his petition in docket No. 15467–80, and in Olympia, Washington, when he filed his petition in docket No. 29911–85.

## FINDINGS OF FACT

### I. *Background*

Petitioner, an attorney, and Harry E. Wright, Jr., were personal friends. At Mr. Wright's request, petitioner drafted the former's last will and testament (will), which Mr. Wright executed on June 20, 1969. Mr. Wright died on November 11, 1969. Under the terms of the will, the residue and remainder of the decedent's estate, after specific bequests, was to be set aside for charitable, educational, and other worthy purposes to be determined by the decedent's attorneys and executors. Petitioner, as executor named in the will, filed the will with the Superior Court of California, County of Santa Clara, on November 18, 1969. Also on that date, petitioner filed a petition for probate of will and for letters testamentary. Shortly thereafter, on November 20, 1969, the decedent's sister, Earline Wright Torcellan, filed a contest in opposition to probate of the will (the will contest). As a consequence, a special

administrator was appointed to take possession of the assets of the estate pending the resolution of the will contest.

Subsequently, all the parties to the will contest entered into a settlement agreement, filed on April 10, 1973, which divided the residue of the decedent's estate between Ms. Torcellan's estate (she died on August 3, 1972) and petitioner, who was then appointed as trustee of the trust. Pursuant to the settlement, the trust received $508,000.

Harry Margolis was a friend and tax adviser to petitioner. With Harry Margolis' assistance, on May 24, 1971, petitioner, as trustee and as a trustee with others, established the trust. The trust declaration provided that the funds of the trust were to be used solely within the United States and its possessions for:

religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, either directly or by contributions to organizations duly authorized to carry on such activities and which have established their tax-exempt status under the provisions of Section 501(c)(3) of the Internal Revenue Code.

Petitioner served as one of the trustees of the trust from its inception until November 20, 1984. According to the trust's bylaws, its principal office was petitioner's address at his law office.

Petitioner's policy as trustee of the trust was to support the types of charitable activities that he believed the decedent had favored, especially charities which furthered human rights and benefited Native Americans. On October 29, 1971, pursuant to an application filed by petitioner as trustee for the trust, respondent recognized the trust's exemption from Federal income tax, classifying it as a private operating foundation under sections 509(a) and 4942(j)(3). The trust was reclassified as a nonoperating private foundation in 1976.

Harry Margolis and his law firm, Margolis, Chatzby & Dunnett, located in Los Gatos, California, represented the trust. The trust filed Federal income tax returns as an exempt private foundation (Form 990-PF) for the taxable years 1976 through 1981. The trust's taxable year was a calendar year.

On May 15, 1980, respondent mailed separate notices of deficiency for 1976 and 1977 to the trust and to petitioner,

as trustee. In the notice of deficiency mailed to the trust, respondent determined deficiencies in excise taxes, in part, under sections 4944(a)(1) and (b)(1) and 4945(a)(1) and (b)(1). In the notice of deficiency mailed to petitioner, respondent determined the deficiencies set forth above under docket No. 15467–80. The deficiencies determined for both the trust and petitioner under sections 4944 and 4945 were based on the same underlying transactions described below.

On May 8, 1985, respondent mailed separate notices of deficiency for 1978 through 1984, and the taxable period ending May 8, 1985, to the trust and to petitioner, as trustee. In the notice of deficiency mailed to the trust, respondent again determined deficiencies, in part, under sections 4944(a)(1) and (b)(1) and 4945(a)(1) and (b)(1). In the notice of deficiency mailed to petitioner, respondent determined the deficiencies set forth above under docket No. 29911-85. Again, the deficiency determinations for the trust and petitioner were based on the same transactions described below.

Meanwhile, on November 30, 1984, the California Superior Court entered an order removing petitioner, as of November 20, 1984, as trustee of the trust and as executor of the estate of Harry E. Wright, Jr., for self-dealing, failure to file an accounting and close the decedent's estate, failure to maintain proper books and records, and distributions contrary to the trust declaration.

By orders dated February 3, 1989, and February 6, 1989, respectively, we dismissed the cases of *Harry E. Wright, Jr., Charitable Trust v. Commissioner,* docket No. 29912–85, and *Harry E. Wright, Jr., Charitable Trust, c/o John E. Thorne, Trustee v. Commissioner,* docket No. 15478–80, for failure to prosecute, thereby holding the trust liable for the deficiencies determined by respondent, including those under sections 4944(a)(1) and (b)(1) and 4945(a)(1) and (b)(1).

## II. *Transactions Engaged In by the Trust*

### A. *The ABC Investment*

On August 1, 1976, petitioner, as a trustee of the trust, executed an agreement with the Aruba Bonaire Curacao Trust Co., Ltd. (ABC), a Bahamian corporation. The agreement referred to, and sought to affirm, a prior agreement

entered into by the trust and ABC on or about October 9, 1973.

Under the August 1, 1976, agreement, ABC acknowledged that it received $508,502.40 from the trust on or about October 9, 1973. This amount constituted the entire corpus of the trust. ABC further acknowledged that it received two additional deposits of $250,000 each from the trust on January 14, 1974. The trust acknowledged that it had received certain sums of interest and principal from ABC through August 1, 1976. The agreed annual rate of interest on the deposits under both agreements was 5 percent.

The initial sum of $508,502.40 transferred by the trust to ABC in 1973 was a demand deposit. The two subsequent transfers of $250,000 were each time deposits. The time deposits were subsequently modified and terminated, and $194,000 was returned to the trust by ABC on or about June 10, 1975. As of August 1, 1976, the balance of the trust's remaining demand deposit with ABC was $677,942.40. As of December 31, 1977, the balance of the account was $674,942.

Petitioner entered into the original agreement with ABC based, at least in part, on the advice of his friend and attorney, Mr. Harry Margolis. Several of Mr. Margolis' other clients had deposits with ABC. Mr. Margolis assured petitioner that ABC was a good place to deposit money because it would pay a higher rate of interest than domestic banks and the funds would be available whenever needed. Mr. Margolis did not provide petitioner with a written legal opinion to this effect.

Petitioner did not make personal inquiries into ABC's integrity. Consequently, it was not until sometime in 1988 that he discovered that ABC's license to do business had been revoked in June of 1973 and its charter had been struck from the register of Bahamian companies in September of 1973.

None of the other trustees voiced any objections to petitioner with regard to the agreements with ABC. Nor did any of them request, at least prior to May 15, 1980, that petitioner agree to remove the trust's funds from deposit with ABC.

B. *Grants in General*

The trust maintained a domestic checking account with Sumitomo Bank of California (Sumitomo), on which it wrote

checks to make charitable grants. When the trust needed funds to make grants, petitioner would request that Mr. Margolis contact ABC and have the money transferred to the Sumitomo account. Petitioner's requests were never denied. Although all of the trustees had a voice with regard to the trust's affairs, petitioner effectually had ultimate control over direction of the trust's funds and selection of the grant recipients.

Petitioner, in his capacity as a trustee, signed all of the checks drawn on the trust's Sumitomo account. Petitioner's former secretary, Marion Wilhelm, handled the business side of petitioner's law office, including some matters involving the trust. Among other things, Ms. Wilhelm was responsible for maintaining the trust's check register and preparing grant files on prospective recipients of the trust's funds. Ms. Wilhelm was also a trustee of the trust.

Before the trust actually made a grant, each of the trustees signed a form letter indicating consent. Prior to petitioner's receiving the notice of deficiency mailed to him on May 8, 1985, none of his fellow trustees had ever requested that he correct any of the expenditures made by the trust.

Petitioner understood that, when the trust made grants to both individuals and organizations, a certain amount of responsibility was required to assure that the funds were properly spent by the recipients. Whenever petitioner decided to make a grant to a nonexempt organization or an otherwise "questionable" recipient, he sought Mr. Margolis' advice. Mr. Margolis usually responded with his personal opinion and emphasized the importance of accounting for how the funds were spent by the recipient. Petitioner did not receive a written legal opinion from Mr. Margolis with regard to any of the grants which are now at issue.

When the trust made a grant to an exempt organization, petitioner always requested a copy of its exemption letter. If the donation was made to an individual or a nonexempt organization, petitioner sent the recipient a copy of a letter prepared by Mr. Margolis explaining expenditure responsibility and that expenditure responsibility reports were required.

The trust never sought approval of its grant-making procedures from the Internal Revenue Service before it made grants to individuals. However, petitioner sent individual recipients a letter prepared by Mr. Margolis explaining that

it was necessary for them to account for the manner in which the funds were spent.

The following is an example of the type of letter sent with the grants made by the trust:

Dear People:

On           , the above named Trust granted you the sum of $     . The Trust is a charitable trust and is required by law to report the grants which the Trust makes. The Trust must also require the recipient to report to it regarding the expenditure of such funds. Therefore, we would greatly appreciate it if you would give us the following information:

1. For what purpose the money was spent;

2. The breakdown of the items for which it was spent; and

3. How much of the grant was spent, stating total or partial amounts.

We trust we will be receiving your report shortly. Thank you for your anticipated cooperation in this matter.

Sincerely,
John E. Thorne, Trustee

The trust did not receive such reports from any of the recipients whose grants are in issue.

During the years in issue, 1976, 1977, and 1980 through 1983, the trust made numerous grants to organizations and individuals, including those described below.

### 1. *Grants Made During 1976 and 1977*

During 1976, the trust made the following grants now in issue:

| Recipient and (check number) | Amount |
| --- | --- |
| American Indian Movement (#222) | $2,500 |
| American Indian Treaty Council Information Center (#243) | 1,000 |
| Mr. Arthur Kinoy (#241) | 3,500 |

During 1977, the trust made the following grants now in issue:

| Recipient and (check number) | Amount |
| --- | --- |
| American Indian Movement (#209) | $200 |
| American Indian Treaty Council Information Center (#263) | 2,000 |
| National Lawyers' Guild (#264) | 1,000 |
| American Civil Liberties Union Foundation of Southern California (#270) | 1,000 |
| Marxist Study Series (#271) | 7,000 |
| Mr. James McSigue (#278) | 717 |

The check (#263) petitioner wrote to make the $2,000 grant to the American Indian Treaty Council Information Center in 1977 was actually made payable to the "American Indian Treaty Council". When petitioner wrote the check, he inadvertently omitted the words "Information Center".

Although the trust's returns for both 1976 and 1977 list the American Indian Treaty Council Information Center (AITCIC) as a "nonexempt" organization, its exempt status was recognized by the Commissioner on May 21, 1975. Therefore, the grants made to the AITCIC in 1976 and 1977 are not taxable expenditures, and respondent concedes that they are no longer in issue.

The purpose of the grants made to the American Indian Movement (AIM) was to assist it in providing legal aid to indigent Indian defendants. As indicated by the trust's returns for both 1976 and 1977, AIM was not an exempt organization.

The trust's return for 1977 also lists the Marxist Study Series (hereinafter sometimes referred to as the MSS) as a nonexempt organization. The return lists the exempt status of the National Lawyers' Guild and the American Civil Liberties Union Foundation of Southern California as "undetermined". However, neither of these organizations was an exempt organization.

Both Mr. Kinoy and Mr. McSigue are individuals. The $3,500 grant made to Mr. Kinoy, a Rutgers University professor, was to assist him in writing a book entitled "Rights on Trial". The $717 grant made to Mr. McSigue was to assist him financially in continuing his education.

2. *Domestic Grants Made During 1980 and 1981*

During 1980, the trust made the following grants now in issue:

| *Recipient and (check number)* | *Amount* |
| --- | --- |
| Mr. Jimmie Durham (#355) | $500 |
| Ms. Erica Drexel (#373) | 816 |
| Marxist Study Series (#342) | 2,000 |
| Marxist Study Series (#360) | 1,500 |
| Marxist Study Series (#376) | 500 |
| Marxist Study Series (#389) | 2,000 |
| National Alliance Against Racist and Political Repression (#339) | 3,500 |

During 1981, the trust made the following grants now in issue:

| Recipient | Amount |
|---|---|
| Mr. Jimmie Durham (#437) | $250 |
| Mr. Jimmie Durham | 250 |
| Ms. Becky Neff (#458) | 1,000 |
| Marxist Study Series (#420) | 2,000 |
| Marxist Study Series (#449) | 2,000 |
| Marxist Study Series | 2,000 |

Although the record does not include at least two of the checks written to Mr. Durham and the MSS during 1981, petitioner does not dispute that the above amounts were paid to those recipients during that year. As indicated by the trust's returns for 1980 and 1981, neither the MSS nor the National Alliance Against Racist and Political Repression was an exempt organization. Mr. Durham, Ms. Drexel, and Ms. Neff are all individuals. The $816 grant made to Ms. Drexel in 1980 was to assist her with travel expenses incurred in attending a family health conference in Boston. Although the trust's return for 1980 states that Ms. Drexel was not related to the trust, she is actually petitioner's oldest daughter. The $1,000 grant made to Ms. Neff in 1981 was to assist her in paying personal medical costs. The trust's 1981 return describes Ms. Neff as having no relation to the trust. However, Ms. Neff is Ms. Wilhelm's daughter. As stated above, Ms. Wilhelm was a trustee of the trust. The trust's returns for both 1980 and 1981 show that the $500 grants made to Mr. Durham during those years were to assist him in writing a book concerning the historical struggles of American Indians.

### 3. *Foreign Grants Made During 1981*

In 1981, petitioner wanted to retire from his law practice and, consequently, also desired to terminate his activities with regard to the trust. However, petitioner did not send any notification to respondent concerning termination of the trust. In fact, petitioner legally remained a trustee until November 20, 1984, and the trust was not legally terminated until 1986. Furthermore, the trust continued to receive some funds and make some grants after 1981.

Petitioner asked Mr. Margolis if he knew of any charitable organizations dealing with world peace and hunger to which the trust could contribute its remaining funds. Mr. Margolis orally recommended that petitioner consider Intercultural Cooperative Foundation (ICF), of Switzerland, and Fundacion Soberana Order de San Juan de Jerusalem (Fundacion), of Costa Rica.

Mr. Margolis provided petitioner with a brochure describing ICF's activities. He also informed petitioner that he previously had an attorney, Ms. Terzian-Feliz, "check out" Fundacion for another client, Werner Erhard. Consequently, petitioner did not independently confirm Mr. Margolis' personal opinion and statements regarding the organizations. However, at the time of Ms. Terzian-Feliz's investigation, Fundacion had not yet been formally organized to do business in Costa Rica.

After deciding to make the grants to ICF and Fundacion, petitioner effectuated several loans and transfers on behalf of the trust by way of a very complex plan designed by Mr. Margolis. As a result of the maze of transactions, the trust made the transfers described in the subsequent paragraphs.

On August 27, 1981, petitioner arranged for a transfer of $750,000 from the trust's account with Barclay's Bank of California to the account of Island Bank at Barclay's Bank International, Tortola, British Virgin Islands. On September 15, 1981, the trust transferred $45,000 from its account at Barclay's Bank of California to the Erhard Foundation for EST (Erhard Foundation), Zurich, Switzerland. On December 17, 1981, the trust transferred $250,000 from its account at Barclay's Bank of California to the account of Island Bank at the First National Bank of Boston, Panama Branch.

On Friday, December 18, 1981, $1 million was transferred from Island Bank's account at Barclay's to Sarasin Bank, Zurich, to the account of ICF. This transfer was made via Barclay's Bank, Zurich. On that same day, Mr. Wolfgang Somery of ICF instructed Sarasin Bank to immediately transfer the $1 million to the First National Bank of Boston, Panama, in favor of the account of Fundacion. This transfer was made through the Bank of America to ensure rapid transfer.

In anticipation of these transfers, on December 12, 1981, Mr. van Walsum of ABC prepared a Panama Transaction Summary (PTS), indicating that on December 17, 1981, $1

million would be transferred from the trust to ICF, then from ICF to Fundacion, then from Fundacion to Werner Erhard Associates (WEA) in San Francisco. On December 21, 1981, Mr. van Walsum sent Ms. Ines Teague a telex stating that "the remittance for one million dollars from Bank of Boston to WEA was made today. Funds will be available in WEA's account with Barclay's tomorrow." The $1 million was credited to Fundacion's account in Panama on Tuesday, December 22, 1981.

On its 1981 return, the trust reported the transfers to Fundacion and ICF as contributions. The return lists ICF as a tax-exempt foundation "in various countries including the United States". It also lists Fundacion as a tax-exempt foundation in Costa Rica. The return does not indicate that any money was transferred to WEA, which is not an exempt organization. The return also reflects, as a contribution, the $45,000 transfer by the trust to the Erhard Foundation on September 15, 1981. The return states that the Erhard Foundation was a tax-exempt foundation in Switzerland.

### 4. *Domestic Grants Made During 1982 and 1983*

On February 10, 1982, Ms. Doris Brin Walker wrote to petitioner requesting funds from the trust on behalf of the Marxist Study Series, as she had done in the past. On March 1, 1982, Mr. Margolis wrote Ms. Walker a letter explaining that future requests should be addressed to "Mr. E.B. van Walsum, Aruba Bonaire Curacao Trust Company Limited". The last sentence of the letter instructed her that copies of the requests should also be forwarded to petitioner, "since the funds ultimately relate back to his good graces". A copy of the letter was sent to petitioner and ABC, and a postscript to Mr. van Walsum indicated that the matter was handled through a Mr. Somery of ICF.

Subsequent to receiving the letter from Mr. Margolis, Ms. Walker addressed her future requests to "Harry E. Wright, Jr., Charitable Trust; c/o E.B. van Walsum; Aruba Boniare Caracao Trust Company Limited". During each of the years 1982 and 1983, Ms. Walker received at least $2,000 on behalf of the MSS, drawn on the account of Island Bank, in this manner.

III. *Audits of the Trust and Petitioner*

A. *Taxable Years 1976 and 1977*

The audit of the trust for the taxable years 1976 and 1977 began in June of 1978. The examination of petitioner's conduct regarding the trust for those same taxable years began sometime in 1979 or 1980. The audits of the trust and petitioner's conduct were performed by Mr. Les Brandin. Petitioner was represented in the audit by Mr. Walter Joe and Mr. Margolis, and the examination took place in Mr. Margolis' office. Petitioner was aware that the audit was ongoing.

Mr. Brandin prepared a report of examination with regard to both the trust and petitioner. The reports were dated March 31, 1980, and mailed to both petitioner and Mr. Margolis. Although it is unclear whether petitioner actually received the reports directly from Mr. Brandin, it is clear that he received a copy of them from Mr. Margolis no later than April 17, 1980.

Mr. Brandin's normal practice was to discuss the topics of correction and removal at the time the issues arose within the audits. However, although he made the matters known to petitioner's representatives, he did not formally request that such actions be taken.

In his report of examination for the trust for 1976 and 1977, Mr. Brandin determined that the demand deposit with ABC was an investment which jeopardized the trust's charitable purposes (a jeopardy investment). Mr. Brandin made this determination on the basis of several factors, including information that ABC's license had been revoked prior to the trust's making the deposit, a lack of verification of ABC's assets, and irregular interest payments. Mr. Brandin also determined that the grants made in 1976 and 1977 and described above were taxable expenditures.

The report concerning the trust proposed, in part, excise taxes under sections 4944(a)(1) and (b)(1) and 4945(a)(1) and (b)(1). It provided a definition of "jeopardy investment", and explained how liability for additional taxes could be avoided with removal of the investment from jeopardy. Likewise, the report defined "taxable expenditure", and explained how

liability for additional taxes could be avoided by correcting such expenditures.

The report of examination concerning petitioner's conduct in trust matters proposed liability for 1976 under section 4945(b)(2). The report also further proposed liability under sections 4944(b)(2) and 4945(b)(2) for 1977. Like the report to the trust, the report to petitioner explained how removal of the jeopardizing investment and correction of the taxable expenditures could be accomplished. However, neither report specifically demanded or requested that the investment be removed from deposit with ABC or that the expenditures be corrected. The notice of deficiency mailed to petitioner and the trust on May 15, 1980, for 1976 and 1977 mirrored the audit reports.

B. *Taxable Years 1980-83*

Respondent's audits of the trust and petitioner's conduct with regard to the trust for the taxable years 1978 through 1983 began sometime in April of 1984. Again, the audits were performed by Mr. Brandin. However, this time they took place in the office of Mr. Kenneth Postada, who represented petitioner following Mr. Margolis' death. Mr. Postada was a colleague of Mr. Margolis. Mr. Postada represented petitioner under an executed power of attorney for the years 1978 through 1981.

The report of examination concerning the trust proposed, in part, excise taxes under section 4945(a)(1) and (b)(1) based on the expenditures described above. Unlike the prior audit report, the report involving the years 1980 through 1983 did not discuss the legal consequences of taxable expenditures and their correction. Rather, it merely listed the expenditures which Mr. Brandin determined to be taxable expenditures.

The report of examination concerning petitioner was organized in the same manner. However, the notice of deficiency mailed to petitioner on May 8, 1985, like the prior notice for 1976 and 1977, explained the legal consequences of correction. Neither of the reports concerning the trust or petitioner was dated, and petitioner did not receive the reports until he received the notice of deficiency dated May 8, 1985.

Again, Mr. Brandin's practice was to discuss correction of taxable expenditures with petitioner's representative when

the issue came up during the course of the audit. As before, he did not specifically make a written request that petitioner take corrective action with regard to the expenditures.

OPINION

I. *Background to Sections 4944 and 4945*

Sections 4944, Taxes on Investments Which Jeopardize Charitable Purposes, and 4945, Taxes on Taxable Expenditures, first appeared in the Internal Revenue Code as part of subchapter A of a new chapter 42 added to the Code by the Tax Reform Act of 1969, Pub. L. 91-172, sec. 101(b), 83 Stat. 487, 512. Congress enacted subchapter A of chapter 42 in an effort "to put an end, as far as it reasonably could, to the abuses and potential abuses associated with private foundations." *Mannheimer Charitable Trust v. Commissioner,* 93 T.C. 35, 39 (1989).

In general, section 4944(a)(1) imposes an excise tax on each investment which jeopardizes the exempt purposes of a private foundation. Section 4945(a)(1) imposes an excise tax on each taxable expenditure made by such a foundation. The taxes imposed by subsections (a)(1) are to be paid by the private foundation. When there is tax imposed by a respective subsection (a)(1), sections 4944(a)(2) and 4945(a)(2) may impose excise taxes on the management of the foundation as well. The subsections (a)(1) and (a)(2) taxes are defined as "first tier" excise taxes. Sec. 4963(a).

Additional excise taxes of much greater severity are imposed by subsections (b)(1) and (2) of sections 4944 and 4945. These taxes are defined as "second tier" taxes. Sec. 4963(b). The subsections (b)(1) taxes are imposed upon the foundation only where the investment is not "removed from jeopardy within the taxable period", or the taxable expenditure is not "corrected within the taxable period". Secs. 4944(b)(1), 4945(b)(1), as amended by the Act of Dec. 24, 1980, Pub. L. 96-596, sec. 2(a)(1), 94 Stat. 3469. The subsections (b)(2) taxes are imposed upon any foundation manager who "refused to agree to part or all" of the removal or the correction where there is a subsection (b)(1) tax.

The purpose of the December 24, 1980, amendment to the private foundation excise tax provisions, including sections 4944 and 4945, was to ensure that courts would have juris-

diction to enforce the second-tier taxes. Pub. L. 96-596, *supra* (the 1980 amendments); see *Larchmont Foundation v. Commissioner,* T.C. Memo. 1982-145 (Larchmont II); H. Rept. 96-912 (1980), 1980-2 C.B. 657.

The 1980 amendments are applicable to second-tier taxes assessed after December 24, 1980, except where there is a court decision with regard to which res judicata applies on that date. Accordingly, we have held that the 1980 amendments apply to cases which have been commenced before the passage of the amendments but not tried until after their effective date. See *Barth Foundation v. Commissioner,* 77 T.C. 1008 (1981); *Howell v. Commissioner,* 77 T.C. 916 (1981); Larchmont II, *supra.* Therefore, the amendments are applicable to the cases now before us.

Subchapter C (redesignated subchapter D by the Omnibus Budget Reconciliation Act of 1987, Pub. L. 100-203, sec. 10712(a), 101 Stat. 1330-465), as applicable for the years at issue, governs the abatement of second-tier taxes where there is correction of the taxable event within the "correction period." See sec. 4961. If a court decision holding that a foundation or foundation manager is liable for a second-tier tax becomes final, the issue of whether correction has occurred, and, thus, whether the assessment should be abated, is to be resolved in a supplemental proceeding by that same court. Sec. 4961(b). For the years now at issue, the first-tier taxes are mandatory and cannot be avoided by subsequent remedial action of the foundation or a manager. *Mannheimer Charitable Trust v. Commissioner, supra* at 40; *German Society of Maryland, Inc. v. Commissioner,* 80 T.C. 741, 744 (1983).

Issues involving the excise taxes imposed by sections 4944 and 4945 have reached the courts on few occasions. See *German Society of Maryland, Inc. v. Commissioner, supra* at 745. Because of the lack of judicial interpretation in the area of foundation excise taxes, the Treasury regulations and legislative history provide most of the guidance available to us. The regulations promulgated under both sections were adopted in 1972, 3 years after passage of the statutes, and have not been substantially modified since that time. Therefore, we must give great weight to the regulations in interpreting the provisions under which they were promulgated. *Commissioner v. South Texas Lumber Co.,* 333 U.S. 496 (1948); *Peach*

*v. Commissioner,* 84 T.C. 1312 (1985), affd. without published opinion 805 F.2d 393 (4th Cir. 1986).

## II. *Burden of Proof*

The first issue for decision is whether the burden of proof with respect to the tax imposed by section 4945(a)(2) lies with respondent or petitioner. Petitioner does not dispute that he bears the burden of proving that respondent's determinations under sections 4944(b)(2) and 4945(b)(2) are erroneous. Section 4945(a) provides:

SEC. 4945(a). INITIAL TAXES.—

(1) ON THE FOUNDATION.—There is hereby imposed on each taxable expenditure (as defined in subsection (d)) a tax equal to 10 percent of the amount thereof. The tax imposed by this paragraph shall be paid by the private foundation.

(2) ON THE MANAGEMENT.—There is hereby imposed on the agreement of any foundation manager to the making of an expenditure, knowing that it is a taxable expenditure, a tax equal to 2½ percent of the amount thereof, unless such agreement is not willful and is due to reasonable cause. The tax imposed by this paragraph shall be paid by any foundation manager who agreed to the making of the expenditure.

Although the term "knowing" is not defined in the Code, section 53.4945-1(a)(2)(iii), Foundation Excise Tax Regs., provides:

(iii) *Knowing.*—For purposes of section 4945, a foundation manager shall be considered to have agreed to an expenditure "knowing" that it is a taxable expenditure only if—

*(a)* He has actual knowledge of sufficient facts so that, based solely upon such facts, such expenditure would be a taxable expenditure,

*(b)* He is aware that such an expenditure under these circumstances may violate the provisions of federal tax law governing taxable expenditures, and

*(c)* He negligently fails to make reasonable attempts to ascertain whether the expenditure is a taxable expenditure, or he is in fact aware that it is such an expenditure.

For purposes of this part and chapter 42, the term "knowing" does not mean "having reason to know." However, evidence tending to show that a foundation manager has reason to know of a particular fact or particular rule is relevant in determining whether he had actual knowledge of such fact or rule. Thus, for example, evidence tending to show that a foundation manager has reason to know of sufficient facts so that, based solely upon such facts, an expenditure would be a taxable expenditure is relevant in determining whether he has actual knowledge of such facts.

As a general rule, the burden is upon the taxpayer to prove that a determination made by respondent is erroneous. Rule 142(a). This Rule stems from the reasoning that "the taxpayer is the party most familiar with the facts upon which he based his return and is in a better position to produce evidence supporting such facts if called upon to do so". *Larchmont Foundation, Inc. v. Commissioner,* 72 T.C. 131, 134 (1979) (Larchmont I), vacated and remanded without published opinion on another issue 659 F.2d 1085 (7th Cir. 1981). However, under certain circumstances, the Commissioner must prove the correctness of her determination. Sec. 7454(b); Rule 142(c).

For purposes of section 4945(a)(2), petitioner contends that respondent bears the burden of proving: (1) That the expenditures made by the trust were "taxable expenditures", and (2) that petitioner agreed to the making of the expenditures knowing that they were taxable expenditures. Respondent admits that she bears the burden of proving petitioner's conduct was "knowing" within the meaning of section 4945(a)(2). Sec. 7454(b); Rule 142(c). However, respondent argues that the burden of proving the expenditures in issue were not "taxable expenditures" remains with petitioner. We agree with respondent.

The regulations under section 4945(a) make it clear that the burden of proof is on respondent when an excise tax is imposed upon a foundation manager for knowing conduct under section 4945(a)(2). Section 53.4945-1(a)(2)(viii), Foundation Excise Tax Regs., states:

> (viii) *Cross reference.* For provisions relating to the burden of proof in cases involving the issue whether a foundation manager has knowingly agreed to the making of a taxable expenditure, see section 7454(b).

Section 7454(b) provides in part:

> SEC. 7454(b). FOUNDATION MANAGERS.—In any proceeding involving the issue whether a foundation manager (as defined in section 4946(b)) has "knowingly" * * * agreed to the making of a taxable expenditure (within the meaning of section 4945), * * * the burden of proof in respect of such issue shall be upon the Secretary.

Rule 142(c) is derived from section 7454(b) and provides further that "such burden is to be carried by clear and convincing evidence".

In its report on the analogous provision of section 4941(a)(2), the Senate Finance Committee stated:

> Where this first-level tax is imposed, there is also to be a tax of 2½ percent on the foundation manager, but only if the manager knowingly participated in the self-dealing. The tax on the manager may not exceed $10,000. The committee has concluded that, in order to avoid imposing unreasonable burdens upon foundation managers, it is appropriate (1) to apply this sanction to the manager only where the violation is willful and is not due to reasonable cause, and (2) to impose upon the Service the same burden of proof where such a sanction is being considered as is required in cases of civil fraud—that is, proof by clear and convincing evidence. * * * [S. Rept. 91-552 (1969), 1969-3 C.B. 423, 445.]

As we stated in Larchmont I, *supra* at 136, the Senate Finance Committee report:

> shows that Congress was following the pattern well established under the internal revenue laws; that is, when a penalty or addition to tax is imposed on the taxpayer for knowing, willful, or fraudulent conduct, the Commissioner has the burden or proving such conduct, but in other situations, the petitioners have the burden of showing that they are not liable for the taxes determined by the Commissioner.

Fraud cases involve a split burden of proof. The taxpayer must prove any error in the deficiency determination by a preponderance of the evidence, and the Commissioner must prove fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(a) and (b); *Zack v. Commissioner,* 692 F.2d 28 (6th Cir. 1982), affg. T.C. Memo. 1981-700. However, respondent may not rely solely on the taxpayer's failure to prove error in respondent's deficiency determination to satisfy respondent's burden of proof as to fraud. *Petzoldt v. Commissioner,* 92 T.C. 661, 700 (1989). The same split burden of proof is applicable for issues arising under section 4945(a)(2).

It does not make sense to place the burden of proving that a contribution was a "taxable expenditure" on respondent for purposes of section 4945(a)(2), when she does not bear such a burden for purposes of section 4945(a)(1). For purposes of section 4945(a)(1), the private foundation bears the burden of proving a contribution was not a "taxable expenditure". *Mannheimer Charitable Trust v. Commissioner,* 93 T.C. at 41; Larchmont I, *supra.* We see no reason to place this burden on respondent for purposes of section 4945(a)(2) simply because a foundation manager, rather than the foundation, is the taxpayer. This is especially so since imposition of the

subsection (a)(1) tax is requisite to imposition of the subsection (a)(2) tax. Sec. 53.4945-1(a)(2)(i), Foundation Excise Tax Regs.

There is no constitutional impediment to placing the burden of proof on petitioner. *Rockwell v. Commissioner,* 512 F.2d 882 (9th Cir. 1975), affg. T.C. Memo. 1972-133; Larchmont I, *supra; Roberts v. Commissioner,* 62 T.C. 834 (1974). Therefore, we hold that, for purposes of section 4945(a)(2), petitioner must prove any error in the deficiency determination by a preponderance of the evidence, and respondent must prove by clear and convincing evidence that petitioner acted knowingly.

III. *Sections 4944(b)(2) and 4945(b)(2)*

The next two issues we must decide are whether petitioner is liable for Federal excise taxes under sections 4944(b)(2) and 4945(b)(2). Although the two sections address different taxable events, the provisions parallel one another in substance. In addition, several of petitioner's and respondent's arguments regarding the deficiencies are applicable equally to both sections. Accordingly, for convenience, we will discuss both issues together.

First, in the May 15, 1980, notice of deficiency, respondent determined deficiencies against the trust under section 4944(a)(1) and (b)(1) for making an investment which jeopardized the trust's charitable purpose. Respondent determined that section 4944(a)(1) imposed a 5-percent excise tax upon the trust as a result of the ABC investment. As the trust's funds had not been removed from deposit with ABC, respondent further determined that section 4944(b)(1) imposed an additional 25-percent tax upon the trust.

In the May 15, 1980, notice of deficiency addressed to petitioner, respondent also determined that petitioner was liable for a $10,000 additional excise tax for 1977 under section 4944(b)(2) for failure to agree to removal of a jeopardy investment. Respondent argues that petitioner is liable for the tax under section 4944(b)(2) because he refused to agree to remove from jeopardy the $674,942 the trust had on deposit with ABC as of December 31, 1977. Section 4944 provides, in part:

SEC. 4944. TAXES ON INVESTMENTS WHICH JEOPARDIZE
        CHARITABLE PURPOSE.
(a) INITIAL TAXES.—
    (1) ON THE PRIVATE FOUNDATION.—If a private foundation invests any
amount in such a manner as to jeopardize the carrying out of any of its
exempt purposes, there is hereby imposed on the making of such invest-
ment a tax equal to 5 percent of the amount so invested for each year
(or part thereof) in the taxable period. The tax imposed by this para-
graph shall be paid by the private foundation.

                    *    *    *    *    *    *    *

(b) ADDITIONAL TAXES.—
    (1) ON THE FOUNDATION.—In any case in which an initial tax is
imposed by subsection (a)(1) on the making of an investment and such
investment is not removed from jeopardy within the taxable period,
there is hereby imposed a tax equal to 25 percent of the amount of the
investment. The tax imposed by this paragraph shall be paid by the pri-
vate foundation.
    (2) ON THE MANAGEMENT.—In any case in which an additional tax is
imposed by paragraph (1), if a foundation manager refused to agree to
part or all of the removal from jeopardy, there is hereby imposed a tax
equal to 5 percent of the amount of the investment. The tax imposed by
this paragraph shall be paid by any foundation manager who refused to
agree to part or all of the removal from jeopardy.

Although the rate of tax imposed by section 4944(b)(2) is
equal to 5 percent of the jeopardy investment, the amount of
tax imposed on a manager with respect to any one invest-
ment is limited to $10,000 by section 4944(d)(2).

  Section 4944(e)(1) defines the term "taxable period" as fol-
lows:

    (1) TAXABLE PERIOD.—The term "taxable period" means, with respect to
any investment which jeopardizes the carrying out of exempt purposes, the
period beginning with the date on which the amount is so invested and
ending on the earliest of—
        (A) the date of the mailing of a notice of deficiency with respect to the
    tax imposed by subsection (a)(1) under section 6212,
        (B) the date on which the tax imposed by subsection (a)(1) is assessed,
    or
        (C) the date on which the amount so invested is removed from jeop-
    ardy.

The trust transferred its entire corpus to ABC in October of
1973. As of December 31, 1977, the trust had $674,942 on
deposit with ABC. On May 15, 1980, respondent mailed the
trust a notice of deficiency for taxable years including 1977,
thereby ending the taxable period. Sec. 4944(e)(1)(A). The

investment was never removed from deposit with ABC prior to the mailing of the notice of deficiency.

Second, respondent determined in both the May 15, 1980, and the May 8, 1985, notices of deficiency that the trust is liable for first- and second-tier taxes for taxable expenditures under section 4945(a)(1) and (b)(1). At the same time, respondent determined that petitioner is liable for excise taxes under section 4945(b)(2) in the amounts of $3,500 for 1976; $5,958 for 1977; and $5,408, $13,750, $1,000, and $2,000 for tax years 1980 through 1983, respectively. Respondent contends that the expenditures made by the trust during those years, which are described above, are taxable expenditures. Respondent argues that petitioner is liable for the taxes under section 4945(b)(2) because he refused to agree to correct any of the taxable expenditures.

Section 4945 provides, in part:

SEC. 4945. TAXES ON TAXABLE EXPENDITURES.

(a) INITIAL TAXES.—

(1) ON THE FOUNDATION.—There is hereby imposed on each taxable expenditure (as defined in subsection (d)) a tax equal to 10 percent of the amount thereof. The tax imposed by this paragraph shall be paid by the private foundation.

\*     \*     \*     \*     \*     \*     \*

(b) ADDITIONAL TAXES.—

(1) ON THE FOUNDATION.—In any case in which an initial tax is imposed by subsection (a)(1) on a taxable expenditure and such expenditure is not corrected within the taxable period, there is hereby imposed a tax equal to 100 percent of the amount of the expenditure. The tax imposed by this paragraph shall be paid by the private foundation.

(2) ON THE MANAGEMENT.—In any case in which an additional tax is imposed by paragraph (1), if a foundation manager refused to agree to part or all of the correction, there is hereby imposed a tax equal to 50 percent of the amount of the taxable expenditure. The tax imposed by this paragraph shall be paid by any foundation manager who refused to agree to part or all of the correction.

Section 4945(c)(2) limits the tax imposed on the management by subsection (a)(2) to a maximum of $5,000 and limits the tax imposed by subsection (b)(2) to $10,000.

Petitioner has advanced several contentions disputing respondent's deficiency determinations under sections 4944(b)(2) and 4945(b)(2). However, petitioner's primary contention applicable to both sections is that he is not liable for the second-tier excise taxes because he was never

requested to remove the funds from deposit with ABC or to correct any of the expenditures made by the trust, assuming, arguendo, that the investment was a jeopardy investment and the expenditures were taxable expenditures. Petitioner argues that each section imposes an additional excise tax upon a foundation manager only when that manager refuses a request from a fellow foundation manager to remove part or all of an investment from jeopardy or to correct a taxable expenditure.

In support of his argument, petitioner relies on Example (2) of section 53.4945-1(c)(3), Foundation Excise Tax Regs., which is equally applicable to section 4944(b)(2). The example is as follows:

*Example (1).* A, B, and C comprise the board of directors of Foundation M. They vote unanimously in favor of a grant of $100,000 to D, a business associate of each of the directors. The grant is to be used by D for travel and educational purposes and is not made in accordance with the requirements of section 4945(g). Each director knows that D was selected as the recipient of the grant solely because of his friendship with the directors and is aware that some grants made for travel, study, or other similar purposes may be taxable expenditures. Also, none of the directors makes any attempt to consult counsel, or to otherwise determine, whether this grant is a taxable expenditure. Initial taxes are imposed under paragraphs (1) and (2) of section 4945(a). * * *

*Example (2).* Assume the same facts in Example (1). Further assume that within the taxable period A makes a motion to correct the taxable expenditure at a meeting of the board of directors. The motion is defeated by a two-to-one vote, A voting for the motion and B and C voting against it. In these circumstances an additional tax is imposed on the private foundation in the amount of $100,000 (100 percent of $100,000). The additional tax imposed on B and C is $10,000 (50 percent of $100,000 subject to a maximum of $10,000). B and C are jointly and severally liable for the $10,000, and this sum may be collected by the Service from either of them.

No cases or further provisions of the regulations under subchapter C explain who may make a request of a foundation manager to take corrective action for purposes of sections 4944 and 4945. Consequently, petitioner insists that the example makes it clear that a foundation manager must refuse the request of another foundation manager to trigger imposition of a tax under section 4944(b)(2) or section 4945(b)(2). We disagree.

Rather, we agree with respondent that she, as well as a fellow foundation manager, may request a foundation man-

ager to remove an investment from jeopardy or correct a taxable expenditure. As respondent correctly points out, if petitioner's contention were correct, then an individual who is the sole manager of a private foundation could never incur liability under subsections (b)(2).

In drafting the provisions under subchapter C, Congress intended to stop abuses that were occurring within private foundations. *Mannheimer Charitable Trust v. Commissioner,* 93 T.C. at 39. One of Congress' means was to provide an incentive for alleviation of the second-tier taxes upon voluntary compliance with the statute. Obviously, lone managers of private foundations, as well as managers who possess ultimate control over their foundations, were not intended to be excluded from the objective of the provisions.

Accordingly, we hold that respondent may make a request upon a foundation manager to remove an investment from jeopardy or to correct a taxable expenditure, and that refusal to agree to correction may result in imposition of a subsection (b)(2) tax.

We must next decide whether respondent made such requests of petitioner and whether petitioner refused those requests. Respondent contends that during the audits of the trust's tax returns and petitioner's conduct as trustee, petitioner's legal representatives were informed about the requirements of removal and correction. Respondent further contends that petitioner was sent a copy of the audit reports asserting the second-tier taxes under sections 4944(b)(2) and 4945(b)(2), as well as the notices of deficiency. Respondent concludes that, because the deposit was not removed from ABC and the expenditures were not corrected, petitioner is liable for the second-tier excise taxes determined under sections 4944(b)(2) and 4945(b)(2).

Petitioner contends that respondent never requested that he agree to remove the investment from ABC or correct the expenditures made by the trust. Rather, petitioner maintains that, at the most, he merely failed to remove the funds from ABC. Consequently, petitioner argues that *failing* to remove the investment or correct the expenditures is significantly different than *refusing to agree* to remove the investment or correct the expenditures. We agree.

Respondent's interpretation of subsections (b)(2) imposes a liability upon a foundation manager which appears to arise

simultaneous to the liability imposed by subsections (b)(1) applicable to foundations. In reading subsections (b)(2) in this manner, respondent ignores the differences in the language of subsections (b)(1) and subsections (b)(2). Section 4944(b)(1) imposes liability for the second-tier tax on a foundation "in any case in which an initial tax is imposed by subsection (a)(1) [imposing a first-tier tax] on the making of an investment and such investment is not removed from jeopardy within the taxable period". Section 4945(b)(1) similarly imposes liability for the second-tier tax on a foundation "In any case in which an initial tax is imposed by subsection (a)(1) on a taxable expenditure and such expenditure is not corrected within the taxable period". We note that a time period for correction is specified in subsections (b)(1), whereas no time period is specified in subsections (b)(2) cited below.

The second-tier tax is subsequently imposed by section 4944(b)(2) on the foundation management "In any case in which an additional tax is imposed by paragraph (1) [imposing a second-tier tax on the foundation], if a foundation manager refused to agree to part or all of the removal from jeopardy". Section 4945(b)(2) similarly imposes a second-tier tax on the foundation management "In any case in which an additional tax is imposed by paragraph (1), if a foundation manager refused to agree to part or all of the correction". The relevant language in these provisions is identical.

Sections 4944 and 4945 contain a scheme in which a first-tier tax is imposed and the foundation has an opportunity to correct the prohibited act. The second-tier tax is imposed on the foundation in any case in which the prohibited act is not corrected. Only subsequent to that is a second-tier tax imposed upon any manager of the foundation who "refused to agree" to the correction. No time period is specified, but the fact that the phrase "refused to agree" is in the past tense indicates that the refusal to agree is the triggering event for the imposition of the second-tier tax on the foundation manager.

The legislative history of the original version of these provisions in the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 487, 512, bears out this conclusion.

The committee amendments provide an initial sanction of 10 percent of the amount improperly spent (plus a tax of 2½ percent up to a maximum of $5,000 on any foundation manager who knowingly made the improper expenditure). *The heavier sanction would apply later only if the foundation refused to correct the earlier improper action to the extent possible.* The heavier sanction on the manager would apply only if he refused to agree to part or all of the correction * * * . [S. Rept. 91-552 (1969), 1969-3 C.B. 423, 457; emphasis added.]

In explaining identical language in section 4941(a) and (b), concerning the remedies for self-dealing, the Senate report states:

The second level of tax applies if the self-dealing is not "undone" or (if undoing is not possible) the foundation is not made whole or given the benefit of the bargain within 90 days after the mailing of the deficiency notice with respect to the first level of tax. * * * A second-level tax is also imposed on the foundation manager if he refuses to agree to any part of the correction. * * *

*The second-level sanction, imposed only after a notice of deficiency and adequate opportunity for court review and undoing the self-dealing transaction,* is intended to be sufficiently heavy to compel voluntary compliance (at least, after court review). The committee expects application of this sanction to be rare, but where the parties refuse to undo the transaction, it is expected that this sanction will be applied.

[S. Rept. 91-552, *supra,* 1969-3 C.B. at 445; emphasis added.]

The Senate report describes the initial scheme of the subchapter A excise taxes on private foundations. The second-tier taxes were designed to be applied "later" than the first-tier taxes, "only after a notice of deficiency *and* adequate opportunity for court review *and* undoing the self-dealing transaction." *Id.* (Emphasis added.)

The Senate report also makes it clear that the notice of the prohibited act was intended to be the notice of deficiency, with opportunity for court review, and additional correction time thereafter. The reason that the use of the sanction of a second-tier tax on the foundation manager was expected to be rare was that Congress assumed that after a court decision had been rendered, holding that prohibited conduct had taken place, it would be a rare manager who would persist in refusing to make correction.

In *Adams v. Commissioner,* 72 T.C. 81 (1979), we held that we lacked jurisdiction to redetermine the amount of the deficiency under this statutory scheme, as the amount of the deficiency—which depended upon whether the proscribed

conduct was corrected within a period which extended beyond the publication of our opinion—was not determinable on the date of the mailing of the notice of deficiency by the Commissioner. As no "deficiency" had been determined with respect to the second-tier tax, we consequently lacked jurisdiction to redetermine the correct amount of the deficiency.

The current absence in the statute of formal notice procedure prior to imposition of a second-tier tax for "failure to agree" to correction is an artifact of the 1980 amendments to confer jurisdiction on the courts to impose second-tier taxes by section 2(a)(1) of the Act of December 24, 1980, Pub. L. 96-596, 94 Stat. 3469. Prior to the 1980 amendments, sections 4944(b)(1) and 4945(b)(1) provided that the jeopardizing investment or taxable expenditure was to be removed from jeopardy or corrected within the "correction period", which was defined by section 4941(e)(1) as beginning on the date of the prohibited act and ending 90 days after the later of the mailing of the notice of deficiency or the date on which the decision of the Tax Court becomes final.

The 1980 amendments, in relevant portion, substituted the term "taxable period" for the term "correction period" in sections 4944(b)(1) and 4945(b)(1). "Taxable period" is now defined in section 4944(e)(1) as beginning when the jeopardizing investment is made and ending on the earliest of the date of mailing of a notice of deficiency, the date on which the first-level tax is assessed, or the date on which the amount is removed from jeopardy. Section 4945(i)(2), added by the 1980 amendments and using identical wording in pertinent respects, defines the taxable period as beginning on the date the taxable expenditure is made and ending on the earlier of the date of mailing of a notice of deficiency or the date on which the first-tier tax is assessed.

The 1980 amendments created a new system designed to provide an opportunity for court review and correction of the transaction before requiring the taxpayer to pay the second-tier tax. H. Rept. 96-912 (1980), 1980-2 C.B. 657. It added sections 4961 and 4962, which provide for abatement of second-tier and first-tier taxes, respectively, where there is correction of a prohibited act within the "correction period". Section 4961 provides:

SEC. 4961. ABATEMENT OF SECOND TIER TAXES WHERE THERE IS CORRECTION.

(a) GENERAL RULE.—If any taxable event is corrected during the correction period for such event, then any second tier tax imposed with respect to such event (including interest, additions to the tax, and additional amounts) shall not be assessed, and if assessed the assessment shall be abated, and if collected shall be credited or refunded as an overpayment.

(b) SUPPLEMENTAL PROCEEDING.—If the determination by a court that the taxpayer is liable for a second tier tax has become final, such court shall have jurisdiction to conduct any necessary supplemental proceeding to determine whether the taxable event was corrected during the correction period. Such a supplemental proceeding may be begun only during the period which ends on the 90th day after the last day of the correction period. Where such a supplemental proceeding has begun, the reference in the second sentence of section 6213(a) to a final decision of the Tax Court shall be treated as including a final decision in such supplemental proceeding.

Section 4963(e)(1), also added by the 1980 amendments, similarly defines the "correction period" as beginning on the date on which the prohibited event occurs and ending 90 days after the date of mailing of a notice of deficiency with respect to the second-tier tax imposed on such taxable event, extended by any period in which a deficiency cannot be assessed under section 6213(a), and any additional period which the Secretary determines is reasonable and necessary to correct the prohibited act. Under this scheme, "the second-tier excise tax will be imposed before any litigation begins (in order to insure that the Court will have jurisdiction) but is to be forgiven if the prohibited act is corrected within a correction period". H. Rept. 96-912 (1980), 1980-2 C.B. 657.

The only case in which a foundation manager was held liable for a second-tier excise tax under section 4945(b)(2) is Larchmont II. The controversy in that case was decided on the basis of the foundation manager's refusal, in a prior proceeding, to present evidence on the questions of taxable expenditure or correction. There is nothing in the case which indicates that the question of whether there had been a refusal to agree was ever raised. Therefore, we do not believe that Larchmont II stands for the proposition that failure to correct a taxable expenditure is sufficient to give rise to liability under section 4945(b)(2), without a prior request that such correction be made.

We are unable to accept respondent's view because we are unable to read out of the statute the phrase "refused to agree". Petitioner was never requested to remove the investment from jeopardy or to correct the taxable expenditures, either by a fellow trustee or by respondent, until he received the notices of deficiency. Petitioner was not provided with any requests to agree to take corrective action under either section. Rather, Mr. Brandin, as was his practice, discussed removal and correction with petitioner's representatives as the issues arose during the course of an audit. However, Mr. Brandin never specifically requested that petitioner agree to take such action. It is clear that neither the audit reports nor Mr. Brandin's oral communications to petitioner's representatives serve as valid requests for purposes of sections 4944(b)(2) and 4945(b)(2). We conclude that the 1969 statutory scheme, as explained in the legislative history, intended that the formal demand for correction be the notice of deficiency and that the statute, as currently worded, still requires prior demand and subsequent refusal to agree before liability for refusing to agree can be asserted.

It would be a circular argument to contend that the same document which asserts a liability against a taxpayer under sections 4944(b)(2) and 4945(b)(2) could also serve as the instrument which gives rise to the liability. In other words, it is illogical to maintain that the same notice of deficiency, which notifies a foundation manager of the determination that prohibited conduct has taken place, can also determine liability for failure to agree to correct that conduct.

On the basis of the foregoing, we conclude that no request was made of petitioner to remove the 1977 ABC investment from jeopardy or to correct any of the expenditures made by the trust during the tax years 1976, 1977, or 1980 through 1983. Accordingly, we hold that petitioner did not "refuse to agree" to remove the investment from jeopardy or refuse to agree to correct taxable expenditures. Therefore, petitioner is not liable for the second-tier taxes determined by respondent under section 4944(b)(2) for 1977 or section 4945(b)(2) for 1976, 1977, and 1980 through 1983.

IV. *Section 4945(a)(2)*

The next issue for decision is whether petitioner is liable for the following first-tier excise taxes under section 4945(a)(2):

| Taxable years | Grantee | Grant | Deficiency |
|---|---|---|---|
| 1980 | Mr. Jimmie Durham | $500 | $12.50 |
|  | Ms. Erica Drexel | 816 | 20.40 |
|  | Marxist Study Series | 6,000 | 150.00 |
|  | National Alliance Against Racist and Political Repression | 3,500 | 87.50 |
|  |  | 10,816 | 270.40 |
| 1981 | Mr. Jimmie Durham | 500 | 12.50 |
|  | Ms. Becky Neff | 1,000 | 25.00 |
|  | Marxist Study Series | 6,000 | 150.00 |
|  | Intercultural Cooperation Foundation [1] | 1,045,000 | 5,000.00 |
|  |  | 1,052,500 | 5,187.50 |
| 1982 | Marxist Study Series | 2,000 | 50.00 |
| 1983 | Marxist Study Series | 4,000 | 100.00 |

[1] The $5,000 deficiency determined on the sum of the $1 million transfer to ICF and the $45,000 transfer to WEA represents a concession by respondent, who initially identified three separate transfers subject, by virtue of the sec. 4945(c)(2) limitation, to total tax of $11,125.

Section 4945(a)(2) provides:

SEC. 4945(a). INITIAL TAXES.—

\*  \*  \*  \*  \*  \*  \*

(2) ON THE MANAGEMENT.—There is hereby imposed on the agreement of any foundation manager to the making of an expenditure, knowing that it is a taxable expenditure, a tax equal to 2½ percent of the amount thereof, unless such agreement is not willful and is due to reasonable cause. The tax imposed by this paragraph shall be paid by any foundation manager who agreed to the making of the expenditure.

Section 4945(c)(2) limits the amount of tax imposed upon a foundation manager by section 4945(a)(2) to $5,000 for any one taxable expenditure. Therefore, the deficiency deter-

mined with regard to the $1 million expenditure to ICF in 1981 is $5,000.

As discussed above, for purposes of section 4945(a)(2), petitioner bears the burden of proving that the grants made by the trust are not taxable expenditures. If petitioner fails to meet his burden with regard to any of the expenditures, it is then up to respondent to prove that petitioner agreed to the making of those expenditures knowing that they were taxable expenditures.

Section 4945(d) defines the term "taxable expenditure" as follows:

SEC. 4945(d). TAXABLE EXPENDITURE.—For purposes of this section, the term "taxable expenditure" means any amount paid or incurred by a private foundation—

\* \* \* \* \* \* \*

(3) as a grant to an individual for travel, study, or other similar purposes by such individual, unless such grant satisfies the requirements of subsection (g),

(4) as a grant to an organization (other than an organization described in paragraph (1), (2), or (3), of section 509(a)), unless the private foundation exercises expenditure responsibility with respect to such grant in accordance with subsection (h), or

(5) for any purpose other than one specified in section 170(c)(2)(B).

Petitioner admits on brief that the trust did not obtain advance approval of its grant-making procedures from the Secretary in order to assure that they were objective and nondiscriminatory, as required by section 4945(g), and that it did not exercise expenditure responsibility as required by section 4945(h). Accordingly, petitioner does not dispute that the grants made to the National Alliance Against Racist and Political Repression in 1980 or the Marxist Study Series in 1980 and 1981 are "taxable expenditures". As he has not made an argument with regard to the $816 grant made to his daughter, Ms. Drexel, in 1980, we assume petitioner concedes that it constituted a taxable expenditure under section 4945(d)(3).

A. *Grants to Jimmie Durham and Becky Neff*

Section 53.4945-6(c)(1)(i), Foundation Excise Tax Regs., provides that a private foundation may make grants to "noncharitable" organizations, provided that "The making of

the grant itself constitutes a direct charitable act". Petitioner contends that the grants made to Mr. Durham in 1980 and 1981 and to Ms. Neff in 1981 were for charitable purposes within the meaning of section 170(c)(2)(B), and, therefore, are not "taxable expenditures" under section 4945(d)(5). Respondent argues that petitioner has not established that the grants were made for any charitable purposes. We agree.

Petitioner has failed to establish that the grant made to Ms. Neff in 1981 was for charitable purposes. The trust's return for 1981 states that the grant was made to help Ms. Neff pay medical bills. The return also states that Ms. Neff did not have any relationship to the trust. However, Ms. Neff is actually the daughter of petitioner's former secretary, Ms. Wilhelm, who was also a trustee of the trust. Furthermore, nothing in the record reflects the specific nature of the medical bills that the expenditure was intended to cover. More importantly, there is no evidence that the expenditure was actually used to pay such bills. Accordingly, we find that the grant made by the trust to Ms. Neff in 1981 was not for charitable purposes under sections 170(c)(2)(B) and 4945(d)(5).

Petitioner also argues that at least one of the $500 grants made to Mr. Durham in 1980 and 1981 was for charitable purposes within the meaning of section 170(c)(2)(B). Petitioner acknowledges that one of the grants made to Mr. Durham was to assist him in writing his book on American Indians. However, petitioner insists that the other grant was made to Mr. Durham at a time when he was personally in need of money in order to avoid eviction from his apartment.

Each of the trust's returns for 1980 and 1981 states that the grants made to Mr. Durham during those years were to assist him with the book. Furthermore, at trial petitioner was unable to recall which grant was made for which purpose. Therefore, as stated in our findings of fact, we find that both grants were made to assist Mr. Durham in writing the book. Accordingly, neither grant was for charitable purposes within the meaning of sections 170(c)(2)(B) and 4945(d)(5). Thus, both grants were taxable expenditures.

B. *Grants to Marxist Study Series, 1982-83*

Petitioner contends that, whether or not the payments to the MSS were taxable expenditures, the trust made no pay-

ments to the MSS in 1982 and 1983, as these grants were not made by the trust. Rather, petitioner argues that the grants were made by ICF through ABC. Respondent contends that the trust continued to operate after 1981, receiving money and making grants, including $2,000 to the MSS in each of the years 1982 and 1983.

It is clear from the record that petitioner had considerable influence regarding requests made upon the trust for grants after 1981. For example, upon receiving such requests petitioner often wrote Mr. van Walsum of ABC stating that he should inform ICF that petitioner recommended that a particular grant be made and that the check be forwarded to petitioner for proper handling. The difference concerning the grant requests by the MSS was that Ms. Walker simply wrote directly to Mr. van Walsum as instructed by Mr. Margolis.

The trust continued to exist and operate in 1982 and 1983, albeit on a smaller scale than in previous years. Although the manner in which requests for funds from the trust changed after the transfers to ICF and Fundacion in 1981, petitioner has failed to establish that the trust ceased making grants after that time. Therefore, we hold that the trust made grants of $2,000 in 1982 and $4,000 in 1983 to the MSS. Petitioner admits that the trust did not exercise expenditure responsibility over any grants made to the MSS, and, therefore, such grants are taxable expenditures under section 4945(d)(4).

## C. *Grant to ICF*

Petitioner contends that the grants made to ICF and Fundacion are not "taxable expenditures" because they were made to tax-exempt organizations. Respondent contends that these organizations are not tax-exempt, and, therefore, the grants made to them are "taxable expenditures". Alternatively, respondent contends that these organizations were merely a conduit for a subsequent $1 million transfer to Werner Erhard Associates, which is not a tax-exempt organization.

Section 53.4945-5(a)(5), Foundation Excise Tax Regs., provides:

If a private foundation makes a grant to a foreign organization which does not have a ruling or determination letter that it is an organization

described in section 509(a)(1), (2), or (3), such grant will not be treated as a grant made to an organization other than an organization described in section 509(a)(1), (2), or (3) if the grantor private foundation has made a good faith determination that the grantee organization is an organization described in section 509(a)(1), (2), or (3). Such a "good faith determination" ordinarily will be considered as made where the determination is based on an affidavit of the grantee organization or an opinion of counsel (of the grantor or the grantee) that the grantee is an organization described in section 509(a)(1), (2), or (3). Such an affidavit or opinion must set forth sufficient facts concerning the operations and support of the grantee for the Internal Revenue Service to determine that the grantee would be likely to qualify as an organization described in section 509(a)(1), (2), or (3). * * *

The trust's return for 1981 lists ICF as an organization "tax-exempt in various countries including the U.S.". The return also lists Fundacion as tax exempt in Costa Rica. However, there is no other evidence in the record establishing the status of these organizations as tax exempt in their native countries or the United States.

Petitioner did not present a letter from respondent determining that ICF was an exempt organization in the United States or produce evidence from Internal Revenue Service Publication 78, "Cumulative List of Organizations", listing domestic exempt organizations described in section 170(c). Petitioner further failed to produce any affidavits or opinions which set forth sufficient facts to show that any of the foreign organizations were organizations that "would be likely to qualify as an organization described in section 509(a)(1), (2), or (3)." Sec. 53.4945-5(a)(5), Foundation Excise Tax Regs.

Also, although petitioner claims that he relied on the advice of Mr. Margolis in making the transfers, he did not receive a written legal opinion from him as to the status of the organization. Rather, petitioner relied on Mr. Margolis' oral opinion of ICF and a brochure describing ICF's interests. In fact, the record does not even support a finding that Mr. Margolis' oral opinion regarding ICF included the tax status of the organization. Furthermore, petitioner cannot rely on the opinion which Ms. Feliz provided Mr. Margolis concerning Fundacion, as that organization was not even formally organized at the time she conducted her purported investigation of it. Therefore, we conclude that petitioner has failed to establish that ICF and Fundacion were tax-exempt organizations. Additionally, petitioner has failed to prove that the trust complied with the requirement of making a good faith

determination of the status of these organizations as required by section 53.4945-5(a)(5), Foundation Excise Tax Regs.

Having concluded that petitioner has failed to meet his burden of proof with respect to the above taxable expenditures, we must now look to whether respondent has carried her burden of proving that petitioner agreed to the making of the expenditures knowing that they were taxable expenditures.

## V. *Section 4945(a)(2)—Knowing Conduct*

Section 53.4945-1(a)(2)(i), Foundation Excise Tax Regs., explains section 4945(a)(2) as follows:

(2) *Tax on foundation manager—*

(i) *In general.* Section 4945(a)(2) of the Code imposes, under certain circumstances, an excise tax on the agreement of any foundation manager to the making of a taxable expenditure by a private foundation. This tax is imposed only in cases in which the following circumstances are present:

(a) A tax is imposed by section 4945(a)(1),

(b) Such foundation manager knows that the expenditure to which he agrees is a taxable expenditure, and

(c) Such agreement is willful and is not due to reasonable cause. However, the tax with respect to any particular expenditure applies only to the agreement of those foundation managers who are authorized to approve, or to exercise discretion in recommending approval of, the making of the expenditure by the foundation and to those foundation managers who are members of a group (such as the foundation's board of directors or trustees) which is so authorized. * * *

Section 53.4945-1(a)(2)(ii), Foundation Excise Tax Regs., defines the term "agreement" as follows:

(ii) *Agreement.*—The agreement of any foundation manager to the making of a taxable expenditure shall consist of any manifestation of approval of the expenditure which is sufficient to constitute an exercise of the foundation manager's authority to approve, or to exercise discretion in recommending approval of, the making of the expenditure by the foundation, whether or not such manifestation of approval is the final or decisive approval on behalf of the foundation.

Petitioner was responsible for every aspect of the grants made by the trust, including selection of the recipients. Petitioner's decisions regarding the grants were never refused or altered by the other trustees. Petitioner signed all of the grant checks issued before 1982, and his secretary, Ms.

Wilhelm, maintained the trust's check register and grant files. Petitioner continued exercising his authority and influence with regard to the grants made in 1982 and 1983.

In short, from the record there is no doubt that petitioner effectively possessed and exercised ultimate authority to make decisions on behalf of the trust. Such facts clearly establish that petitioner "agreed" to the making of all expenditures made by the trust, including those now in issue.

Section 53.4945-1(a)(2)(iii), Foundation Excise Tax Regs., sets forth guidelines to determine whether or not a foundation manager agreed to the making of an expenditure by the foundation, "knowing" that it was a taxable expenditure. Specifically, the regulation states:

> (iii) *Knowing.*—For purposes of section 4945, a foundation manager shall be considered to have agreed to an expenditure "knowing" that it is a taxable expenditure only if—
>
> (*a*) He has actual knowledge of sufficient facts so that, based solely upon such facts, such expenditure would be a taxable expenditure,
>
> (*b*) He is aware that such an expenditure under these circumstances may violate the provisions of federal tax law governing taxable expenditures, and
>
> (*c*) He negligently fails to make reasonable attempts to ascertain whether the expenditure is a taxable expenditure, or he is in fact aware that it is such an expenditure.

For purposes of this part and chapter 42, the term "knowing" does not mean "having reason to know." However, evidence tending to show that a foundation manager has reason to know of a particular fact or particular rule is relevant in determining whether he had actual knowledge of such fact or rule. Thus, for example, evidence tending to show that a foundation manager has reason to know of sufficient facts so that, based solely upon such facts, an expenditure would be a taxable expenditure is relevant in determining whether he has actual knowledge of such facts.

As discussed above, respondent bears the burden of proving that petitioner's conduct was "knowing". However, proving that petitioner had actual knowledge of sufficient facts concerning the expenditures, so that, based solely on those facts, the expenditures would be taxable expenditures does not mean that respondent must prove petitioner had actual knowledge that the expenditures made by the trust were taxable expenditures within the meaning of section 4945(d).

Having "actual knowledge of sufficient facts" regarding the expenditures is different than "having reason to know" that the expenditures were taxable expenditures. The former pre-

vents taxpayers from maintaining an ignorance of the Federal foundation excise tax laws and the actions of their foundations in order to escape taxation under section 4945(a)(2). Therefore, the critical determination under paragraph (a) of section 53.4945-1(a)(2)(iii), Foundation Excise Tax Regs., is of what facts regarding the expenditures petitioner had actual knowledge, not whether petitioner actually knew that the grants were taxable expenditures.

After reviewing the record, we hold that respondent has established that petitioner possessed actual knowledge of sufficient facts regarding the grants. First, as already stated, petitioner fully controlled the operations of the trust, including ultimate decision-making authority over all expenditures. Therefore, petitioner was familiar with all of the facts surrounding all of the expenditures in issue.

More specifically, when petitioner was aware that a grantee was a section 501(c)(3) organization, or believed it to be so, petitioner requested that organization to send the trust a copy of its exemption letter. If the trust did not receive an exemption letter or if petitioner was already aware that the grantee was not an exempt organization, it was standard procedure that either he or Ms. Wilhelm would send the grantee a form letter, prepared by Mr. Margolis, requesting certain information. This was also true for grants made to individuals.

With regard to the grantees whose grants are now in issue under section 4945(a)(2), none of the grantees were exempt organizations. Therefore, petitioner would not have received exemption letters from them, and presumably would have mailed out the form letters requesting an explanation of how the funds were spent. However, neither petitioner nor the trust ever received communication back from the grantees accounting for the expenditures, and this was indicated on the trust's returns for 1980 and 1981.

By virtue of his failure to obtain reports from the individual grantees, petitioner had knowledge of sufficient facts regarding the expenditures, so that, based solely on those facts, he knew that the expenditures would be taxable expenditures. Petitioner had actual knowledge that none of these grantees were exempt organizations. He knew that he was required to receive reports from such grantees as part of the exercise of expenditure responsibility, but he failed to

exercise this responsibility by following up on the grants to determine that they were spent for exempt purposes.

Second, under the circumstances, petitioner was also aware that the grants might have violated the provisions of section 4945. Petitioner, who is a lawyer, was well aware that grants must conform to certain requirements. Petitioner was informed of such requirements, at the latest, when respondent mailed him the notice of deficiency for 1976 and 1977 on May 15, 1980. Accordingly, petitioner was attentive to whether or not the grantees were organizations described within section 501(c)(3), i.e., tax-exempt organizations.

Third, the fact that petitioner was aware that certain information was pertinent in determining whether or not a grant was a taxable expenditure, but yet did not procure such information, establishes that he negligently failed to make a reasonable attempt to ascertain the nature of the expenditures. Petitioner mailed the letters and forms at the time the grants were made. He did not follow up on any of the grants for which he did not receive information. Rather, petitioner adopted the attitude that if the grant benefited the grantee in any way whatsoever, then it was a worthy grant, notwithstanding burdensome Federal tax requirements.

In light of the foregoing, we find that petitioner agreed to the making of the expenditures in issue, knowing that they were taxable expenditures. We now turn to whether petitioner acted willfully and without reasonable cause.

Section 53.4945-5(a)(2)(iv), Foundation Excise Tax Regs., defines "willful" as follows:

(iv) *Willful.*—A foundation manager's agreement to a taxable expenditure is willful if it is voluntary, conscious, and intentional. No motive to avoid the restrictions of the law or the incurrence of any tax is necessary to make an agreement willful. However, a foundation manager's agreement to a taxable expenditure is not willful if he does not know that it is a taxable expenditure.

From the record, there is no doubt that petitioner's agreement to the making of the grants was "voluntary, conscious, and intentional". However, a problem arises in considering whether petitioner knew that such grants were taxable expenditures.

It would be inconsistent to interpret the verb "to know" as used in the definition of "willful" agreement in section

53.4945-5(a)(2)(iv), Foundation Excise Tax Regs., as meaning something different than the participle "knowing" within the meaning of section 53.4945-1(a)(2)(iii), Foundation Excise Tax Regs. If we were to interpret the phrase "know that it is a taxable expenditure" as meaning that a foundation manager must have actual knowledge of the legal conclusion that the grants were taxable expenditures, then the explanation of the term "knowing" would be unnecessary.

We believe that the forms of the verb "to know" must be used consistently within subparagraph (2) of this regulation. Therefore, the explanation of the term "knowing" in section 53.4945-1(a)(2)(iii), Foundation Excise Tax Regs., must be taken into consideration in reading section 53.4945-5(a)(2)(iv), Foundation Excise Tax Regs. Accordingly, if a foundation manager has knowledge of sufficient facts concerning a grant to enable him to determine that it would be a taxable expenditure, and if he agrees to the making of the grant in a "voluntary, conscious, and intentional" manner, then he has done so willfully. As we have found that petitioner had actual knowledge of sufficient facts concerning the grants in question to determine that they were taxable expenditures and voluntarily, consciously, and intentionally agreed to the making of such grants, we conclude that petitioner's conduct was willful.

Section 53.4945-5(a)(2)(v), Foundation Excise Tax Regs., further explains:

> (v) *Due to reasonable cause.*—A foundation manager's actions are due to reasonable cause if he has exercised his responsibility on behalf of the foundation with ordinary business care and prudence.

From the record, it is also clear that petitioner's willful agreement to the expenditures was not due to reasonable cause. Petitioner failed to exercise his responsibility with ordinary business care and prudence. As stated above, petitioner had complete responsibility to act on behalf of the trust. Yet petitioner failed to assure that grantees were qualified and that grants were used in a manner consistent with Federal requirements. As petitioner was fully responsible for the actual management of the trust, we find that he failed to exercise his responsibility on behalf of the trust with ordinary business care and prudence. Therefore, his agreement to the expenditures was not due to reasonable cause.

We should note, however, that petitioner argues that in making his decisions involving the grants made by the trust, he acted according to advice given to him by Mr. Margolis. With regard to this matter, suffice it to say that the regulations require that any legal advice be in the form of a "reasoned written legal opinion". Sec. 53.4945-1(a)(2)(vi), Foundation Excise Tax Regs. The record is clear that the advice petitioner received from Mr. Margolis was primarily oral. Therefore, any advice petitioner did receive will not cause him to have acted due to reasonable cause or establish that his conduct was anything but "knowing" and "willful".

## VI. *Section 6684*

The last issue for decision is whether petitioner is liable for the penalties determined by respondent under section 6684 for 1980 through 1983.

Section 6684 provides:

SEC. 6684. ASSESSABLE PENALTIES WITH RESPECT TO LIABILITY FOR TAX UNDER CHAPTER 42.

If any person becomes liable for tax under any section of chapter 42 (relating to private foundations) by reason of any act or failure to act which is not due to reasonable cause and either—

(1) such person has theretofore been liable for tax under such chapter, or

(2) such act or failure to act is both willful and flagrant,

then such person shall be liable for a penalty equal to the amount of such tax.

Section 301.6684-1(c), Proced. & Admin. Regs., provides that for purposes of this section, the term "willful and flagrant" has the same meaning as in section 507(a)(2)(A) and the regulations thereunder.

The regulations explaining section 507(a)(2)(A) define "willful and flagrant" conduct as "at least two acts or failures to act both of which are voluntary, conscious, and intentional." Sec. 1.507-1(c)(1), Income Tax Regs. The regulations provide, in addition, that:

[A] "willful and flagrant act (or failure to act)" is one which is voluntarily, consciously, and knowingly committed in violation of any provision of chapter 42 * * * and which appears to a reasonable man to be a gross violation of any such provision. [Sec. 1.507-1(c)(2), Income Tax Regs.]

These provisions conclude with a reference to the definition of "knowing" within the meaning of section 53.4945-1(a)(2)(iii), Foundation Excise Tax Regs. Hence, section 507(a)(2)(A) defines "willful and flagrant" conduct in the same terms as section 53.4945-1(a), Foundation Excise Tax Regs., defines "willful" and "knowing" conduct. A foundation manager acted "willfully" if he had actual knowledge of sufficient facts so that, solely on the basis of such facts, a particular grant would be a taxable expenditure. In this situation, he made the expenditure either aware that it was a taxable expenditure or negligently failing to make reasonable attempts to ascertain whether it was.

As described above, petitioner repeatedly engaged in "willful" conduct, "knowing" that grants made by the Foundation might be taxable expenditures. He knew that certain procedures were required when the Foundation made grants to individuals or nonexempt organizations. He sent a copy of Mr. Margolis' letter requesting followup information from grantees, but did not require that the procedures outlined in the letter be followed. His total reliance on the oral assurances of Mr. Margolis was not reasonable after the first notice of deficiency was issued in 1980. Furthermore, the making of grants to relatives of the trustees and to petitioner for his own travel to conferences was a practice which would appear to a reasonable man to be a gross violation of the statute.

For these reasons, we hold that petitioner is liable for the penalties under section 6684, except as to the penalties with respect to sections 4944(b)(2) and 4945(b)(2).

*Decisions will be entered under Rule 155.*